**UNITED STATES**

v.

**Clayton A. FOUNTAIN, 254 94 1570 Private First Class (E–2) U. S. Marine Corps.**

**NCM 74 3452.**

U. S. Navy Court of Military Review.

Sentence Adjudged 19 July 1974.

Decided 20 Feb. 1976.

LCDR Frank B. Swayze, JAGC, USN, Appellate Defense Counsel; CAPT Paul H. Duvall, USMCR, Appellate Defense Counsel; MESSRS D. A. Timm and D. A. Ingram, Esq., Individual Defense Counsel; CAPT W. D. Blalock, USMCR, Appellate Government Counsel.

Before CEDARBURG, C. J., and MURRAY and GLASGOW, JJ.

## DECISION

MURRAY, Judge:

Tried to a general court-martial with members in June and July 1974, convened by the Commanding General, 3d Marine Division, FMF, at Subic Bay, Republic of the Philippines, the appellant was convicted, contrary to his pleas, of wrongfully lifting a weapon against his superior commissioned officer; unlawful possession of a dangerous weapon; unlawful detention; premeditated murder; larceny; robbery; assault with a dangerous weapon; and kidnapping, in violation, respectively, of Articles 90, 92, 97, 118, 121, 122, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 890, 892, 897, 918, 921, 922, 928, and 934.

Appellant was sentenced to a dishonorable discharge, confinement at hard labor for life, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the findings and sentence without modification.

Appellant assigns nine errors for consideration by this Court. Each is considered seriatim.

I

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY REFUSING TO ORDER THE ATTENDANCE AT TRIAL OF MATERIAL AND NECESSARY DEFENSE WITNESSES.

Prior to trial on the merits, appellant requested the attendance of four defense

witnesses whose testimony was alleged to be relevant and material to the defense of lack of mental responsibility for the offenses. There is some controversy as to the timeliness of the written pretrial request for the witnesses which was followed by a similar oral request submitted at an Article 39(a) session of the court on 12 July, more than one month after the initial session of the court. This sub-issue is mooted, however, by the failure of the appellant to comply with the procedural requirements for requesting witnesses pursuant to paragraph 115a, MCM, 1969 (Rev.). The request fails to set forth an adequate synopsis of the expected testimony from any of the four witnesses and, at best, relates to circumstances of the appellant's early life, and his relationship to a neglectful mother and an absent father, all of which resulted in development of a violent streak and alleged episodes of amnesic violence.

The request for the four defense witnesses further fails to address the relevancy to the defense case of the inadequately described testimonial scope. During the Article 39(a) session wherein the request was renewed (a month later), defense counsel advised that the details of the expected testimony could not be furnished "because [counsel] was not anxious to discover (sic) the defense case to the trial counsel at (that) time." (R. 93).

When pressed on the expected testimony, defense counsel could not be specific but felt the testimony would be relevant because it "may be the basis of a defense in this case, that there was amnesia on the part of the accused as to the incident." (R. 94). The defense, however, was equivocal even about this, having earlier stated that "some of the testimony goes not so much directly to the issue of sanity, but does speak at least to diminished capacity and we believe that is appropriate on the merits and appropriately raised in the case."

The requested witnesses were all relatives of the appellant who were expected to testify about his background. One, Mrs. Dunlap, was also expected to testify about a specific incident which occurred just prior to appellant's enlistment in which appellant was involved in a violent encounter with three other individuals and told her that he was unable to remember anything about the fight.

Further, as to all four requested witnesses, defense counsel asserted that their presence in court was necessary "so that the members of the court can observe their demeanor and the manner in which they speak was well as what they say." The defense team rejected the suggestion of stipulated testimony and expressed an obvious distaste for such an accommodation when, in describing for the trial judge the necessity of having the witnesses actually attend the trial, it was argued that not only was it necessary for the members to view the witnesses' demeanor, and not only did these witnesses comprise almost the entire defense case, but (if the defense were denied the witnesses) "we would be particularly prejudiced . . . to be faced with the position where the government calls a series of witnesses in person and the defense presents a series of pieces of paper. We feel that would prejudice the defense in this case, and that is why we feel it is necessary to call these witnesses." (R. 93).

■ The issue in the instant case was not whether it was preferred to have live witnesses rather than stipulated testimony so that the court could adequately view the witnesses' demeanor, but rather concerns the materiality and relevance of the anticipated testimony. The Manual for Courts-Martial sets the same standard for both the convening authority and the trial judge in weighing a request for witnesses. It provides that the request is to be determined "on an individual basis in each case by weighing the materiality of the testimony and its relevance to the guilt or innocence of the accused, together with the relative responsibilities of the parties concerned, against the equities of the situation." Paragraph 115a, Manual, *supra. See United States v. Sweeney*, 14 U.S.C.M.A. 599, 606, 34 C.M.R. 379, 386 (1964); *United States v. Iturralde-Aponte*, 1 M.J. 196 (1975). This weighing process rests within

the substantial discretion of the convening authority and trial judge and their decision is to be judged using an abuse of discretion standard.

Looking closely at the defense case is necessary to gain insight as to whether or not the four witnesses were, in fact, material and necessary to the presentation of the defense case. First the defense called Warrant Officer Woodward, the Corrections Officer at the Subic Bay brig who testified that he had observed the accused for 3 months and had been aware of a series of acts of misconduct on the part of the accused. The witness gave very limited lay testimony bearing on any sanity issue, however.

Next, the defense called Chief LaRue, the Correctional Counselor at the Subic Bay brig, whose testimony was patterned much the same as that of Warrant Officer Woodward's. Following the testimony of the brig personnel, the defense offered the stipulated testimony of a Miss Lopez, the girl friend of the deceased, who described how the shooting occurred, stated that that occasion was the only time she had ever seen her boyfriend's assailant, and mentioned that her boyfriend's assailant walked away "as though his body was stiff." The stipulation of Miss Lopez' testimony was followed by a stipulation of Mrs. Dunlap's testimony to the effect:

That Mrs. DUNLAP is the aunt of PFC Clayton FOUNTAIN who resides at 5703 Blueridge Drive, Columbus, Georgia. Since 1966, due to deteriorating relationship between mother, she had become quite close to him, often serving as surrogate mother. She recalls an incident that occurred in 1972, just prior to Clayton A. FOUNTAIN's entry into the U. S. Marine Corps, involving an episode of violence followed by an inability to recall on the part of PFC Clayton A. FOUNTAIN. Apparently, he had been accosted by three men on the streets of Columbus, Georgia, and there was some sort of heated exchange, resulting finally in a brawl between the three men and Clayton A. FOUNTAIN. While Mrs. DUNLAP was not present to view the entire fight, she was on the scene as it was ended. At that time PFC FOUNTAIN stated to her that he had no recollection of the incident except its inception. He asked her what had happened. Days later he was still unable to recount what had occurred. This would conclude the stipulation of testimony of Mrs. DUNLAP.

Following stipulations, the defense called the accused, who related much of his background and testified, among other things, that he has no recollection of anything after an earlier incident aboard ship in which the deceased, Sergeant Wrin, struck him; the first he remembers, after that, was the conversation with Captain Weber in the manager's office, which is subsequent in time to all of the criminal acts of which he was charged; that he has suffered amnesia such as this on prior occasions when he was the victim of violence; that he committed amnesic violence on one occasion when he was attacked by three persons; that his aunt, Mrs. Dunlap, would have testified about this incident if she were in court; that he was struck in the back of the head with a 2 x 4 board during a gang fight when he was 13 years old and has no recollection of a period of two hours following the blow; that he suffered amnesia as to a period of time when he was attacked by others and cut with razors; that, while he was in the Louisville State Hospital, he was attacked by a man with a homemade knife and he committed violence on that man, according to witnesses, but he has no recollection of his actions in response to being attacked; and that the only knowledge he has of the criminal acts he is alleged to have committed in the instant case he gained from what others told him.

Two psychiatrists, Doctors Ilardi and Simpson, then testified as expert witnesses on the issue of sanity. Doctor Ilardi testified, among other things, that he had examined the appellant and, in his opinion, the appellant at the time of the alleged offenses was able to distinguish right from wrong, that at that time the appellant was able to adhere to the right, that the appel-

lant is able to conduct and cooperate in his defense, and that the appellant was able to remember the alleged offenses.

Doctor Simpson's testimony comported with the opinions expressed by Doctor Ilardi including his belief that appellant "has the ability to remember the criminal acts alleged against him." Both psychiatrists did give support to defense theories concerning amnesic violence and Doctor Ilardi advised that such persons "are frustrated and essentially become amnesic over an event involving personal violence." Both psychiatrists, however, categorized appellant as "sociopathic" and, as a result, Dr. Simpson felt the appellant's ability to control his impulses is impaired and at times that he may suffer a partial impairment in his ability to adhere to the right. But, as noted, on the question of whether or not the appellant was capable of remembering the acts with which he is charged, both psychiatrists opined that he definitely was. Thus the case evolved into primarily a question of whether or not the accused was mentally responsible at the time he committed the acts for which he stands convicted, defense counsel having conceded, in both opening statement and final argument, that the accused had shot and killed Staff Sergeant Wrin (R. 138, 328). In final argument, defense counsel repeatedly characterized the accused's mental responsibility as the "real issue" in the case (R. 328, 330); trial counsel devoted his final argument and rebuttal argument to the issue of mental responsibility (R. 326, 327, 331); and, in like manner, the trial judge, in his instructions to the court members, referred to the question of insanity as being "the first issue" in the case and suggested to the members that they, in deliberations, take up the issue of sanity *first* (R. 332). Then, near the end of the very lengthy instructions, the trial judge again called the members' attention to the sanity issue and instructed that the issue of insanity should be the first issue considered in deliberations (R. 347).

■ Defense counsel, in making his request, had pointed up the need for the four lay witnesses from the accused's past, those who had observed him over the years, his brother, father, aunt and uncle, all of whom could be expected to testify as to his actions, be they normal or abnormal, for almost all of his life, and two of whom could describe previous incidents of alleged amnesic violence on the part of the accused after he had been the victim of violence. Nowhere, either in the written request or argument, however, did the defense show that any of these witnesses had any expertise on mental disorders. And while testimony from a lay witness who knows the accused and had observed him can be relevant to the issue of insanity, (Paragraph 122c Manual, *supra*), the defense in the instant case expected testimony from these lay witnesses only as to appellant's general background and not as to any outward manifestations of mental disability or derangement at or close to the time of the offense. Evidence of appellant's mental condition before the time an offense is committed is legally relevant, but is of less probative value than testimony relating to the precise time of the commission of the offense. *Brock v. United States*, 387 F.2d 254 (5th Cir. 1967). This is especially true in light of the fact that the Manual provisions on insanity all speak in terms of mental responsibility "at the time of the offense." Paragraphs 120a and b, Manual, *supra*.

Each of the requested witnesses resided in the southeastern section of the United States while the trial was being held in the Republic of the Philippines. None of the requested witnesses were familiar with the offense. The expected testimony of the father and brother is clearly cumulative. And none of the anticipated testimony of any of the four witnesses has been suggested to contain any rebuttal of the expert psychiatric opinions of ability to distinguish right from wrong and ability to adhere (at least in part) to the right.

Appellant was diagnosed as sociopathic, suffering from a personality fault, but nowhere does the record support appellant's contention of insanity running to a lack of mental responsibility at the time of the

crimes, and this includes any potential testimony expected from the four lay witnesses as delineated by the defense requests. Appellant's own statements to the examining psychiatrists reflect that the basis of his problems are sociopathic vis-a-vis psychotic or neurotic. The report of the sanity board convened for the evaluation of appellant clearly evinces the nature of his personality:

"Taking into consideration all the available facts of this case including the mental status evaluation, FOUNTAIN's past history, and the NMPI . . . the clinical diagnosis of FOUNTAIN's behavior pattern is # 301.7, ANTISOCIAL PERSONALITY. This is generally considered a defect of character, a moral rather than a mental disorder. Individuals with this type of character or behavior pattern are basically unsocialized and their behavior pattern brings them repeatedly into conflict with society. They are incapable of significant loyalty to individuals, groups or social values. They are grossly selfish, callous, irresponsible, impulsive, and unable to feel guilt or to learn from experience and punishment. Frustration tolerance is low. They tend to blame others or offer plausible rationalizations for their behavior. . . . PFC FOUNTAIN was not suffering from a mental defect, disease, or derangement, either at the time of the alleged offenses on 6 Mar 1974 or at the time of my examination or at any time before or since these events."

and further:

"There was no evidence of any neurotic or psychotic defect. Basically . . . this person [is] one who is callous, devoid of any significant attachments or loyalties (except perhaps his father and wife), volatile and given to immediate pleasures, lacking in any significant sense of responsibility, and one, who despite repeated corrections and humiliation, has been unable to modify his behavior. He uses rationalizations and intellectualization to convince himself that his actions are reasonable and warranted. In the patient's own words he considers the ultimate offense to be an 'insult to my manhood' and apparently, in his mind at least, SGT WRIN committed that ultimate offense. . . . This patient displays a classic antisocial personality defect."

It is apparent that the appellant is not suffering from any classical psychosis, neurosis or organic brain disease, but rather from defects and distortions of personality structure. His case illustrates the difficulties both psychiatry and the law can have when confronted with the sociopathic personality.[1] Clearly he is seriously disturbed and misperceives his environment as an angry threatening place, particularly to his manhood, which moves appellant to violent responses. He views the law, as it applies to him, as irrelevant to his own compulsive responses, and while he perceives the legal consequences of his acts in an abstract way, he refuses to avoid them irrespective of the deterrent aspect such consequences provide, while at the same time, he self-servingly contends that he cannot remember anything about them after the fact.

Despite these disorders of perception, cognition, affect, and behavior, it is apparent that appellant was capable of recognizing and understanding both the law and his willful, premeditated disregard for it when he murdered Staff Sergeant Wrin and committed the other grave offenses of which he stands convicted. He was capable of conforming his behavior to the right. He knew right from wrong, but chose to do wrong. In short, although the appellant suffers defects and distortions of personality structure which render him susceptible to frequent and deliberate acts of violence, he remains fully responsible. In our opinion, the appellant was sane at the time of the offenses, and thus the anticipated testimony of the requested, defense (lay) witnesses, which would lend itself, at best, to a corroboration of the personality defects of appellant, was not material to the ultimate substantive issue in this case. Accordingly the denial of their production was not prejudicial to appellant, and his first assignment of error is denied.

## II

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY ADMITTING INTO EVIDENCE, OVER DEFENSE OBJECTIONS, AND FAILING TO INSTRUCT THE COURT MEMBERS TO DISREGARD, CERTAIN STATEMENTS ALLEGEDLY MADE BY THE ACCUSED.

▮ On 6 March 1974, the appellant approached Staff Sergeant Wrin, the murder victim, at a recreation site on Grande Island, Subic Bay, R. P., carrying a loaded 12 gauge shotgun and a .45 calibre pistol. Without any words exchanged between them, the appellant shot Staff Sergeant Wrin in the chest with the 12 gauge shotgun mortally wounding him. First Lieutenant A. J. Caminiti, USMC, a platoon commander of some of the other Marines attending a picnic at the recreation site that day (but not in a command line over the appellant) testified that on the day in question he observed appellant carrying the shotgun and saw him take several hostages after he had shot Staff Sergeant Wrin. Five of the hostages were in Lieutenant Caminiti's platoon. Appellant ordered the hostages to sit in a circle and continued to point the shotgun at them. Lieutenant Caminiti directed other people to clear out of the area, and sent for a medical evacuation helicopter for the fatally wounded Staff Sergeant Wrin. He further testified that he was trying to get other shotguns away from the Filipino guards but that they didn't want to give them up. He urged appellant to "stay calm" and testified that his first communication with appellant was when—

I called out to Fountain as I said and told him we were trying to get the shotguns and stay calm and made sure that he knew who I was and that he recognized me. I told him that I was Lieutenant Caminiti. I knew him from the wardroom, and I asked him if I could come out and talk to him. I figured that I could settle things down a little if I got out there and I could talk. He said it was okay, to come on out and I went out.

I made sure that he knew that I wasn't armed and that I wasn't going to try nothing, and asked him if he thought he needed all of those hostages, tried to talk him into letting some of the hostages go and he said that he wouldn't let them go, he said he needed as many as he could.

Thereafter, Lieutenant Caminiti engaged in causal conversation with appellant, attempting to keep appellant "cool." During this discussion appellant volunteered information concerning the circumstances surrounding the shooting incident. He related how he had stolen the .45 pistol; how he had obtained the shotgun from the Philippine guard, and how he had slain Staff Sergeant Wrin. At trial appellant objected to the admissibility of these statements because they were not preceded by Article 31(b), UCMJ, warnings. In response to questioning, Lieutenant Caminiti testified on this issue:

Q. Lieutenant CAMINITI, what was your reason for going out there to begin with, to join the group?

A. I felt a sense of responsibility for my people, sir.

Q. It was your intention to try and talk with FOUNTAIN?

A. Yes, sir.

Q. And did you in fact try to elicit or to begin some discussions with FOUNTAIN?

A. Yes, sir, I did.

Q. At the time that you began to discuss some of the circumstances surrounding the incident that has taken place or had taken place, did you in fact . . . was he aware that you were a Lieutenant in the Marine Corps?

A. Yes, sir, he was aware that I was a Lieutenant all the time.

Q. Did you provide him any warnings before you began to elicit information about what was going on out there?

A. No, sir, I did not elicit information about what was going on. I was trying to get my people in a safe position.

Q. If you had not approached FOUNTAIN, if you had not begun a discussion,

would . . . is it your contention that FOUNTAIN would have begun to talk to you, if it were not for your instigation of the discussions, PFC FOUNTAIN would have begun to talk with you anyway?

A. I went out there to talk to FOUNTAIN, yes, sir. If I had not gone out there we would not have been able to talk.

Q. Do you recall the exact nature of the questions you . . . asked about?

A. Yes sir, I asked him if he would consider letting some of the hostages go. I don't know if I used the word hostage or not, let some of my people go.

Q. Directing your attention to the conversation that Captain CROUSE applied for you, later conversations, do you remember the questions that you asked in regard to those conversations?

A. In regard to the weapons?

Q. Yes?

A. No, sir, I couldn't really say for sure what I asked him, if I asked him. It was just a spontaneous conversation.

Q. Did you participate in this conversation?

A. Yes, sir, I did.

Q. Did you assist in carrying on the flow of information that was being given?

A. Yes, sir.

Q. And you gave no warnings?

A. No, sir.

Sergeant Spencer, one of the hostages held at gunpoint by the appellant also testified as to certain statements made by appellant as follows:

Q. Sergeant SPENCER, I want to call your attention to the 6th of March 1974 and ask you if you saw the accused on that date?

A. Yes, sir, I did.

Q. Where did you see him?

A. Grande Island up in the Philippines.

Q. About what time was it when you first saw him?

A. Approximately 1400, sir.

\* \* \* \* \* \*

Q. What was he doing the first time that you saw him?

A. The first time that I saw PFC FOUNTAIN he was standing on a road. I looked over there when I heard a gunshot.

Q. What did he do while he was standing on the road?

A. Well, he turned around. He was walking towards the party area.

Q. Would you describe how he was walking?

A. Yes, sir, he had a shotgun down on the side and he was walking with a .45 caliber in his belt.

Q. Could you describe more closely how he was walking, fast, slow?

A. No, just slowly casually walking.

Q. All right, what did you observe him do after this experience. You say you saw him walking?

A. Well, he came to us, I was in the group and he came over to us and he said to freeze, don't move or we were dead. Something to that effect, freeze.

Q. Could you name the people that were in this group?

A. Yes, sir, there was Lance Corporal OBERG, Lance Corporal MILLS, Lance Corporal ROBINSON, Private SACKER, and myself.

Q. All right, what actions did FOUNTAIN take at this point after telling you to freeze?

A. He had us move into one tight group.

Q. What do you mean he had you move in?

A. He told us to all move into one tight group in the corner there.

Q. How did you . . . why did you feel it necessary to do that?

A. Sir, he had a shotgun and .45 caliber pistol.

Q. What was he doing with it during this period of time?

A. He was pointing it in the direction of us.

Q. All right, so where did . . . what did he tell you to do?

A. To move into one tight group.

Q. What happened next?

A. I would say we were there for a while. I was sitting in the party area and he was observing everyone around and then he was talking to a Navy Warrant Officer demanding a few things. He wanted to see the CO of the ship.

Q. How did you know this was a Navy Warrant Officer?

A. I knew him from the ship, sir.

 * * * * * *

Q. Go ahead.

A. After that he kicked over a park bench there and used it for a barricade. I am not sure what he was going to do with it. Then he had us form two single lines and march up to the middle of the baseball field. There we sat in a circle.

Q. How long did you remain at the baseball field?

A. I would say approximately one hour.

Q. Who's idea was it to move out on the baseball field?

A. PFC FOUNTAIN's, for the better protection.

Q. Who, naming names, was out on the baseball field?

A. It was Lance Corporal OBERG, Lance Corporal ROBINSON, Lance Corporal MILLS, Private SACKER, and myself.

Q. And again, why did you . . . why did you follow this group on into the ball field?

A. Sir, he had a shotgun.

Q. Do you have any idea about how far it was from this area 8 that you are talking about to the ball field? You can refer to the chart if you would like and make an estimate as to how far this movement was.

A. Oh, about 100 yards, sir. I would say approximately 100 yards.

Q. Now, with the exception of anything that you said, did you have any conversation with the accused while you were on the ball field?

A. Yes, sir, we had a lot of casual talk. We were talking among ourselves.

Q. Okay, who was it that initiated these conversations generally?

A. It was either myself or Lieutenant CAMINITI that started the conversation, talking about different things.

Q. Did you ask any questions?

A. Yes, sir, I did. I asked questions to PFC FOUNTAIN, and the other troops that were there.

Q. What was the purpose of your asking these questions?

A. Well, sir, one of the first questions I would ask, you know, he would say, he said that he just killed himself a staff.

Q. What was your purpose of conducting the conversations?

A. I was curious to find out why.

TC: Your Honor, I may be getting in to (sic) the area that might require a closed session. I am not sure how the court feels on this point at the present time.

MJ: Members of the court, may I ask the court to withdraw, please?

REP NOTE: The members of the court withdrew.

The court recessed at 1114 hours, 16 July 1974. The Article 39(a) session was called to order at 1115 hours, 16 July 1974.

 * * * * * *

Questions by the prosecution:

Q. Sergeant SPENCER, I am going to ask you some questions about some specific portions of conversations that you may have had with the accused while you were out on the ball field. These areas generally are areas regarding the acquisition of the pistol, the shotgun, and the third area involving the shooting of Staff Sergeant WRIN. Now, were there any conversations out on the ball field involving these three areas?

A. Yes, sir, the reason for shooting Staff Sergeant Wrin?

Q. Well, just generally speaking whether there were any conversations in these three areas?

A. Yes, sir, there was.

Q. Do you know what prompted the conversations, why they started out?

A. I am not sure if the questions were asked or if they just came out on their own because we were discussing them.

Q. Do you know if PFC FOUNTAIN stole the shotgun or did you put any direct questions at him like that?

A. I don't know if I asked him, but it was asked how did he get the .45 caliber pistol and he explained how he got that and brought it to the island and then got the shotgun.

Q. You don't know who asked?

A. I am not sure, sir, if I had asked that question or not.

Q. Are you sure someone asked?

A. Yes, sir.

Q. PFC FOUNTAIN still had the shotgun at this time?

A. Yes, sir.

TC: Your Honor, I think I have gone about as far as I can go in this area. I believe this particular witness is in a different status than was Lieutenant CAMINITI. For that reason I would ask to go ahead in this area and ask the same questions of this witness that I asked Lieutenant CAMINITI.

MJ: All right, I am interested in having the witness detail as explicitly as he can the circumstances surrounding the accused (sic) statements concerning the .45 caliber pistol, the shooting of Staff Sergeant WRIN, and the shotgun. You can take these each in turn and ask the witness . . .

TC: Yes, sir.

MJ: . . . what the circumstances were surrounding the statements and then you may ask him about the statements themselves.

TC: All right.

Q. First, in regard to the pistol, exactly what was going on at the time that this remark was made about the pistol?

A. We were sitting in the middle of the baseball field and we were talking and it came up and he told us how he had gotten the .45 caliber pistol.

Q. He came out and told you that?

A. Yes, sir.

Q. Was that in response to a question?

A. Yes, sir.

Q. Who asked the question?

A. I am not sure, sir. I am not sure. Lieutenant CAMINITI also asked some questions and I am not sure of he asked the question or if I did. I had asked quite a few questions.

Q. Moving on a little bit to the shotgun, do you recall specifically how that area happened to be breached?

A. How he had gotten the shotgun?

Q. No, how that happened to come up in a conversation?

A. That came up in a conversation.

Q. How?

A. He explained to us how he had gotten a shotgun.

Q. Was that in response to a question?

A. Yes, sir.

Q. Did you ask the question?

A. Yes, sir, I think I asked the question how he got the shotgun.

Q. Did you ask it so you could testify in court or out of curiosity?

A. Yes, sir.

Q. How about the area involving the actual preparation for and the actual shooting of Staff Sergeant WRIN. Was that area brought up?

A. Yes, sir.

Q. What prompted this discussion of this particular area?

A. I am not sure who asked the question, sir.

Q. Was there a question asked?

A. I don't think so, sir. It was just that he had brought it up on his own telling us how he had done it and why he had done it.

Q. Do you know what was going on immediately before he started to relate this portion of the conversation about the preparation and the shooting?

A. Do I know what was going on, sir?

Q. Right, immediately proceeding that? Did you observe anything going on at all? Anything unusual?

A. I don't know what you mean by that, sir.

Q. Well, I am just after the general surrounding circumstances when all of a sudden this man came forward with a statement of about how he shot Staff Sergeant WRIN. I was wondering if you observed anything that might have prompted this?

A. No, sir.

\* \* \* \* \* \*

## CROSS EXAMINATION

Questions by the defense (LIEUTENANT JOHNSON):

Q. Sergeant, was Private First Class FOUNTAIN's remarks regarding where he got the .45 caliber pistol in response to questions by you or Lieutenant CAMINITI?

A. Yes, sir.

Q. So, in other words, you had been questioning him for a while and this was prior to his making a remark?

A. I am not sure what you mean, sir?

Q. Well, you had been asking questions, both you and Lieutenant CAMINITI?

A. Yes, sir.

Q. Prior to his making remarks?

A. Yes, sir.

Q. On how he killed the Staff Sergeant and why?

A. Right.

Q. You were not clear to whether those remarks were direct responses to specific questions?

A. Yes, sir, they were direct responses.

Q. Either you or Lieutenant CAMINITI asked him?

A. Yes, sir.

Q. Except why he killed the staff?

A. Yes, sir.

Q. It just all came out?

A. I am not sure how it came out, just that different statements were made.

Q. You do remember definitely asking questions?

A. Yes.

Q. And that Lieutenant CAMINITI asked a series of questions also?

A. Yes, sir.

Q. And these questions included among other things, where did you get the .45?

A. Yes.

Q. And where did you get the shotgun?

A. Yes.

Q. Why did you shoot the staff?

A. That is correct.

Q. The Private First Class responded.

A. Yes, sir.

Q. Do you know what Article 31 is, Sergeant?

A. Yes, sir.

Q. Do you know what the rights entail in Article 31 when a man has to be warned before he can be questioned?

A. Yes, sir.

Q. Did you give those warnings to Private First Class FOUNTAIN?

A. No, sir.

Q. Did Lieutenant CAMINITI?

A. No, sir, not to my knowledge.

Q. What was your rank on March 6th?

A. Sergeant.

Q. In terms of the group of men other than FOUNTAIN, would you say that you were in charge of the group of men until Lieutenant CAMINITI showed up?

A. Yes, sir.

Q. During his absence?

A. Yes, sir.

Q. Of course you were a member of the Marines on that day?

A. Yes, sir.

IMC: I have no further questions.

TC: I have no further questions, Your Honor.

IMC: Your Honor, we do object. We do interpose at this point an objection to this witness regarding comments of the accused which he made.

### EXAMINATION BY THE COURT

Questions by the Military Judge:

Q. Sergeant SPENCER, could you tell the court why you asked questions of the accused relative to the pistol and the shotgun?

A. Yes, sir, I was curious as to why this had happened. There was a lot of talk going on, sir, casual talk, different statements came out.

Q. Over how long a period were these conversations?

A. About an hour, sir.

Q. You said there was a lot of talk. Would you tell the court what other matters were discussed?

A. What do you mean by that, sir? Do you mean anything that was brought up?

Q. You have indicated there was a good deal of conversation or conversations. As you recall it now, what did you talk about?

A. Why he had done this, what reason behind it, how he went about getting the .45, how he had brought it to Grande Island, what he did after he got there. How he got the shotgun. That is about all I can remember, sir, about the conversations.

Q. So, all of the conversation that you recall were with relationship to the pistol, the shotgun, and the shooting of Staff Sergeant WRIN?

A. Yes, sir.

MJ: In light of the questions by the Military Judge, does either side have any qustions (sic) of thw (sic) witness?

TC: Sir, I have just one.

### REDIRECT EXAMINATION

Questions by the prosecution:

Q. Sergeant SPENCER, were there no other subjects spoken about at all out on the ball field other than the shotgun and pistol and the other things that were discussed casually?

A. Yes, sir.

Q. I think that is what the Military Judge is asking.

A. I am not sure if I can remember all that went on.

Q. There were some other casual conversations other than concerning the pistol and rifle?

A. Yes, sir.

MJ: Does either side have any questions of the witness?

TC: No, sir.

IMC: No, Your Honor.

MJ: The objection by the defense is overruled. I will allow Sergeant SPENCER, when the members return, to relate the substance of the conversations that he took part in and the statements by the accused.

IMC: Your Honor, if I may this time object on an alternative basis. We think the anticipated testimony is cumulative. The remarks are the same as already testified to. In fact the entire rest of this witness testimony is objected to.

### EXAMINATION BY THE COURT

Questions by the Military Judge:

Q. Well, as you now recall Sergeant SPENCER, what did the accused say with regard, let's take the pistol. What did he say with regard to the pistol?

A. He had broken into the ships armory and taken the pistol. He had taken it apart and put it into his pockets and carried it to Grande Island. Once he got there he put it together and used it to get the shotgun.

Q. What did he say about the shotgun?

A. He had just gone up to the guard and taken the shotgun from the guard.

Q. And what did the accused say concerning the shooting of staff Sergeant WRIN?

A. After he shot him in the chest, he said, you ought to have seen the blood just pop up out of his chest. That is about all he had said about shooting Staff Sergeant WRIN.

Q. You also said that he made statements as to why?

A. Yes, sir, the accused had gotten written up by Staff Sergeant WRIN for wearing PT gear on the mess deck in the messhall.

Q. And that is as you recall his explanation of why he shot Staff Sergeant WRIN?

A. Yes, sir.

MJ: The objection by the defense as to the testimony of the witness would be cumulative is overruled and I will allow the witness to testify in this particular area. Are there any other matters then gentlemen?

IMC: No, sir.

TC: No, sir.

During the argument on the issue of admissibility of the statements of the appellant, the trial judge observed that the issue, as he saw it, was whether or not this was a situation cloaked with "officiality" and, if so, then Article 31(b) warnings would be required, and, if not, then such warnings would not be required notwithstanding that Lieutenant Caminiti and Sergeant Spencer were the superiors of the appellant.[1]

At the time of trial (June and July 1974), this was a correct assessment of the "officiality test" which had been the standard heretofore applied and which had been affirmed as late as 7 November 1975 by the United States Court of Military Appeals in the case of *United States v. Seay*, 1 M.J. 201 (1975). The high Court overrode the "official capacity" test shortly thereafter, however, and set down a new standard for determining when an Article 31(b) warning is required. The Court feels this new standard can be more easily applied than the official capacity test. This standard, articulated in the case of *United States v. Dohle*, 1 M.J. 223 (1975), decided on 14 November 1975, establishes a standard which turns on the "position of authority" occupied by the "questioner" over the "accused or suspect" at the time of the interrogation or request for a statement. The Court held:

. . . that where a person subject to the Code interrogates—questions—or requests a statement from an accused or suspect over whom the questioner has some *position of authority* of which the accused or suspect is aware, the suspect must be advised in accordance with Article 31. [Emphasis supplied].

In the *Dohle* case, the questioner was a noncommissioned officer, who, although a personal friend of the accused, had been assigned as a guard over the accused while the accused's transfer to confinement was being arranged. Without advising him of his rights under Article 31, UCMJ, the questioner asked the accused about the theft of some rifles, and testified that he only asked him in a personal capacity and "out of confusion and bewilderment as to why anyone would want to take the rifles." The United States Court of Military Appeals held in *Dohle* that because the questioner was in a "position of authority" over the accused both as a guard and as a noncommissioned officer, he should have warned the accused before requesting a statement in response to his question. The case was obviously one in which the accused did not "spontaneously volunteer" any information and his response was specifically in reply to the question which elicited it. The Court noted that Article 31 does not imply nonpersonal motives are necessary before the Article becomes applicable, and that—

Indeed, in the military setting in which we operate, which depends for its very existence upon superior-subordinate relationships, we must recognize that the position of the questioner, regardless of his motives, may be the moving factor in an accused's or suspect's decision to speak. It is the accused's or suspect's state of mind, then, not the questioner's that is important. Dohle, *supra*.

Prior to the *Dohle* case, there would have been little question that the statement tak-

---

1. The trial judge twice instructed the members in this area: immediately after receiving testimony on the admissions made by appellant, and again during his final instructions on the findings as to the members' responsibility to determine the voluntariness of the statements, the requirement, if any, for warnings under Article 31(b), and the weight standard to the accorded statements if found to be voluntary.

en from the appellant in the instant case was not taken in the course of "an official interrogation" and thus was admissible. *United States v. Fisher*, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972). Neither Lieutenant Caminiti nor Sergeant Spencer was not trying to perfect a criminal case against appellant and there was no need to interrogate appellant. He had committed a murder in front of many eye witnesses. Further, Lieutenant Caminiti was trying to save his life and the lives of appellant's hostages by keeping appellant "cool" through casual conversation. In no sense could it be said that appellant was interrogated or subjected to coercive tactics. Indeed, it is clear that appellant was in complete command of the situation as he held a shotgun on his hostages throughout the entire period. Therefore, the conversation between appellant and the hostages, which had all the appearances of voluntary statements, having as its purpose the saving of human life rather than the investigation of a crime, did not appear at the time to come within the purview of Article 31(b).

However, since the "officiality" test has been overridden by the high Court, the factual question of whether or not the appellant volunteered his comments on his own as opposed to making them in response to questions or requests made by Lieutenant Caminiti and/or Sergeant Spencer assumes additional importance since the new standard of "position of authority" of the questioner is the criteria by which we now must judge, after the fact, as to whether or not the requirement for an Article 31(b) warning was present. If the responses were purely spontaneous and voluntary, there would be no need to determine the second prong of the issue, i. e. the "authority figure" of the questioner. The facts are not that clear in the instant case, however, as to whether or not the appellant actually made his comments and admissions notwithstanding the questions by the lieutenant or the sergeant, or would have done so even in the absence of such questions, or, in fact, only made them because he was asked.

Assuming the most unfavorable position in this regard, that is that the appellant would not have made any statement adverse to his interests had he not been asked certain questions at the time that he was holding a loaded shotgun on the questioner and other hostages, the decisive point that must be established is whether or not the questioner was in some *position of authority* over the appellant at the time. There is no question that Lieutenant Caminiti and Sergeant Spencer were both superior in grade to the appellant, although neither was in a command line over the appellant. One was a commissioned officer and one a superior noncommissioned officer. The appellant apparently knew the grade of each and there is no factual dispute over either his awareness of the individuals or of their status as officer and NCO, respectively. In the *Dohle* case, *supra*, the grade of the questioner was pointed out as one of the factors upon which the Court found him to be in a position of authority over the accused, but grade alone was not the controlling factor. In that case, *Dohle*, the questioner was in an authority position over the accused, i. e. guard to prisoner, as well as being a superior noncommissioned officer. In the instant case, while the questioners were superior in grade to the appellant, there was no possible way for the questioners to exert any authority over appellant, and in fact the reverse was quite the case. Appellant was in complete charge of the situation. He was holding a loaded 12 gauge shotgun, with which he had already mortally wounded another "superior," and the sole purpose of Lieutenant Caminiti and Sergeant Spencer's dealings with the appellant was to try to save lives and cool down a highly dangerous and explosive situation. At no time was either the officer or noncommissioned officer in a position to exert any authority over the appellant, and in fact, notwithstanding the obvious disparity in grade between the participants, it was the appellant who was clearly in a position of control over his superiors. The facts made it so, and the situation was hardly one in which either the officer or the noncom-

missioned officer could exert influence over the appellant by virtue of their office at the moment. In truth, they handled the situation rather well by not forcing the issue over who should have been the superior-subordinate, and there does not appear to have been any question in the mind of the appellant at the time as to who was in charge of the situation.

As the Court of Military Appeals pointed out the *Dohle* case, the concern is not with the voluntary statements that are made by an accused spontaneously or without prior police action (both of which standards can be reasonably viewed here), but rather with statements made by a person subject to the Code, in response to questions by a person subject to the Code, when the questioner is "in a position of authority over the accused or suspect." (The key issue in the instant case). The setting in which the parties found themselves was certainly not a routine military setting which depended for its very existence upon the superior-subordinate relationship as emphasized in *Dohle*, and contrary to the setting in the *Dohle* case, the status of the questioners in the case *sub judice* was clearly not the "moving factor in the appellant's decision to speak" whether or not that "decision" was voluntary and spontaneous or as a result of questions and conversation elicited to calm the appellant, cool an extremely dangerous situation and to save the lives of the hostages. Under the precise fact situation of the instant case, we find that neither Lieutenant Caminiti nor Sergeant Spencer was in an actual position of authority over the appellant notwithstanding that they were superior in grade, and that the moving factor in appellant's decision to speak, even if in reply to questions, was not the status of either the lieutenant or the sergeant in a superior-subordinate relationship. On the precise facts of the instant case we can distinguish the result in *Dohle* by utilizing the specific standard laid down by the high Court through the "position of authority" test. Appellant's second assignment of error is denied.

## III

**THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY FAILING TO ORDER THE PRODUCTION OF NOTES UPON WHICH A GOVERNMENT WITNESS BASED HIS TESTIMONY.**

■ At an early Article 39(a) session on 18 June 1974, while the defense was requesting further psychiatric evaluation of the accused, the defense also requested the notes prepared as a result of an examination of the accused by Doctor Ilardi, a psychiatrist, which the doctor said were substantial, for the purpose of cross-examination (R. 50). The defense request was couched under the authority of paragraph 115(c) of the Manual, *supra*. The trial judge deferred ruling on the defense request noting that that particular 39(a) session was for the purpose only of determining whether or not further inquiry into the mental capacity of the accused should be made (R. 58).

The next day, the defense renewed its request for production of the notes, citing as authority the Jencks Act, 18 U.S.C. § 3500, and the case of *United States v. Albo*, 22 U.S.C.M.A. 30, 46 C.M.R. 30 (1973). The trial judge denied the request and defense counsel then moved, under the same authority, for an *in camera* inspection so that the trial judge could "examine those notes and make available to the defense any or all notes or materials in his (Doctor Ilardi's) possession relating to this defendant which relate to his testimony and prospective testimony at trial." This request was also denied by the Court.

Appellant claims that the denial of the defense motions for the production of these notes taken by the psychiatrist who examined him prior to trial was error. During trial of the case *sub judice*, after the defense had rested its case in reply on 17 July, the government recalled Dr. Ilardi as a rebuttal witness. (R. 282). Following direct examination, the defense counsel elicited from the witness that he had taken "copious" notes during the course of the evaluation of appellant and he used the

notes in preparing his report on appellant. (R. 285–286). Defense counsel then renewed his motion for production of Dr. Ilardi's notes in an Article 39(a) session. The trial judge questioned Dr. Ilardi and was advised:

Q. Doctor, I wonder if you could, sir, could you describe to the court what these notes are? What they contain?

A. Okay, these are process notes that I take when I am interviewing the patient. Many times it consists of an exact phrase, let's say, one I think is particularly pertinent. Other times, probably for the most part, it consists of these ideas that he points out to me and speaks. I could say, generalize from the ideas or make a supposition, hypothesis from his ideas as he is giving them to me. Other parts of my notes are some psychological testing, IQ testing, and also included in the packet that I had, of course, are the reports of various witnesses at the scene that I read. Also included are xerox copies of Private First Class FOUNTAIN's behavior while in the Corrections Center. These are particularly valuable at the time in determining whether some acts were abnormal and to give me information as to what was happening. Mostly, though, what they are are some observations of Private FOUNTAIN, my observations of Private FOUNTAIN or any patient aht (sic) see and conclusions to test, hypothesis that I make, and again, called out phrases of the personality that I am looking for, and of course, there is historical data that I take, his childhood, parents, past history of any past criminal offenses, his likes and dislikes, anything that I feel is pertinent.

After also ascertaining that the witness had not referred to the notes to refresh his recollection prior to testifying and that the notes were not in the Doctor's possession, but were still in transit between Subic Bay and Bethesda, Maryland, the trial judge again denied the defense motion. (R. 286B). Examination of the authorities cited by the appellant for production of the notes reveal that they are not applicable in this instance. Paragraph 115c, MCM, 1969 (Rev.) reads:

c. Use and examination of documentary and other evidence in control of military authorities. If documents or other evidentiary materials are in the custody and control of military authorities, the trial counsel, the convening authority, the military judge, or the president of a special court-martial without a military judge will, upon reasonable request and without the necessity of further process, take necessary action to effect their production for use in evidence and, within any applicable limitations (see 151b(1) and (3)), to make them available to the defense to examine or to use, as appropriate under the circumstances. See also 44h.

The "Jencks Act", 18 USC § 3500 provides generally:

After a government witness testifies on direct examination, the defense is entitled to the production of documents that are (1) statements of the witness as defined by the statute, (2) in the possession of the government, and (3) related to the subject matter of the witness' testimony. (If a statement meets the statutory criteria, the defense has a right to its production without showing that the document is inconsistent with the testimony of the witness or that it would be useful for impeachment.)

When doubt exists about whether the statute compels production of a particular statement, the government should submit it to the Trial Judge for an *in camera* determination.

The term statement used herein means:

(1) a written statement made by the (testifying) witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, for a transcription thereof, if any, made by said witness to a grand jury.

Production of Dr. Ilardi's notes was not required either under paragraph 115(c) of the Manual, *supra*, or under 18 U.S.C. § 3500, the "Jencks Act." The notes cannot be construed as *documents* under the Manual provisions. They might possibly be categorized as "other evidentiary material", however, but items in that category are to be made available to the defense only "if" they are "in the custody and control of military authorities." At both sessions when the motion was raised (18 June and 17 July), Doctor Ilardi testified that the notes were in transit somewhere between Subic Bay and Bethesda, Maryland, with the rest of the Doctor's household goods. (R. 51 & 286B). Unquestionably, the notes were not in the actual custody of the witness or naval authorities. They were in the hands of a commercial contract carrier, and, in all reasonableness, cannot be said to have been in control of the military at all. Subsection (c) of paragraph 115 is couched in terms of reasonableness and "without the necessity of further process" and "as appropriate under the circumstances." Requiring the government to delay the trial until Doctor Ilardi's possessions were delivered to a place many thousands of miles from the situs of the trial and on some unknown date in the future and then returned to the Philippines would not have been reasonable, especially in light of their questionable evidentiary value and relevance. The trial judge's denial of the motion to the extent that it was based on paragraph 115c, was proper and well within his discretion.

As for the alternative source for production of the notes, i. e. 18 U.S.C. § 3500, Doctor Ilardi's notes were not discoverable under the Jencks Act for two reasons: first, they did not constitute a "statement" within the meaning of the act; and secondly, they were not in the actual possession of the government.

The United States Supreme Court in *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959) articulated precisely what constituted a statement for purposes of 18 U.S.C. § 3500.

. . . It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. . . . . It is clear from the continuous congressional emphasis on "substantially verbatim recital," and "continuous narrative statements made by the witness recorded verbatim, or nearly so . . . that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions.

In the case *sub judice*, it is apparent that Dr. Ilardi's notes do not constitute a "statement" in this sense. The notes contained only selected portions of his interviews with appellant. They were clearly not the "substantial verbatim recital" envisioned by the legislature. They were precisely the type of "summaries of an oral statement which evidence substantial selection of material" which the Supreme Court held in *Palermo* were not discoverable under the Jencks Act. *See United States v. Aviles*, 315 F.2d 186 (2d Cir. 1963), and *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969).

At trial, the defense cited *United States v. Albo*, 22 U.S.C.M.A. 30, 46 C.M.R. 30 (1972) in support of its motion for the notes and appellate defense counsel relies heavily on *Albo* in his brief. *Albo*, however, is clearly distinguishable from the instant case because in *Albo* the requested notes were notes taken by a CID agent during an

interview with a confidential informant which contained the description upon which the accused's apprehension was based. Additionally the notes had been used by the agent to refresh his recollection before testifying. In the instant case, Dr. Ilardi did not refer to his notes before testifying. Moreover, the requested notes are not notes of a law enforcement officer upon which an important issue such as probable cause to apprehend is based. They are instead "process notes" consisting of phrases or ideas used by appellant in conversations with the Doctor, that are combined with numerous other sources of information to make up the whole evaluation upon which the Doctor based his diagnosis. They include observations, conclusions, and hypotheses. They were not detailed objective description by a confidential informant, but rather were subjective impressions of what Dr. Ilardi felt was pertinent (R. 286A), such as "information that he gives me verbally and nonverbally related [to] his effect [sic], his emotionality; the way he thinks, what he says, what he dresses like, how he walks into my office, get as much information as we can and it is on the total sum of all of this that an opinion is formed." (R. 287). Such selective and subjective material is clearly not the type of notes envisioned by the Court of Military Appeals in *Albo*.

Finally, these notes, as pointed out above, were not a statement within the intention of the Jencks Act. They were, instead, a "psychiatric workup" of the type held not subject to production under the Jencks Act in *United States v. Brakefield*, 43 C.M.R. 828 (A.C.M.R.1971), *pet. denied*, 21 U.S.C.M.A. 604, 43 C.M.R. 143 (1971); pet. for reconsideration denied, 21 U.S.C.M.A. 606 (1971).

Appellant's third assignment of error is denied.

## IV

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY FAILING TO INSTRUCT SUA SPONTE ON LAY TESTIMONY.

Appellant acknowledged that by the time the "case at bar reached the instruction stage [it] had evolved primarily into a question of whether or not the [appellant] was insane at the time of the alleged offenses, defense counsel having repeatedly conceded that [appellant] shot and killed the deceased." Appellant contends, however, that in view of this prime issue the trial judge erred in failing to instruct sua sponte on lay testimony, specifically that the trial judge was required to instruct the members that lay testimony relating to mental responsibility or abnormal conduct can overcome expert psychiatric testimony to the contrary. Additionally, appellant contends that the trial judge was required to specifically instruct the members that lay witnesses should not be ignored just because experts have testified. It is clear that the responsibility for proper instructions to the members rests with the trial judge. *United States v. Sitren*, 16 U.S.C.M.A. 321, 36 C.M.R. 477 (1966). Equally clear is the fact that appellate courts will not apply the waiver doctrine to erroneous or omitted instructions when to do so would result in a miscarriage of justice. *United States v. Moore*, 12 U.S.C.M.A. 696, 31 C.M.R. 282 (1962); *United States v. Brux*, 15 U.S.C.M.A. 597, 36 C.M.R. 95 (1966); and *United States v. Pond*, 17 U.S.C.M.A. 219, 38 C.M.R. 17 (1967). Exactly what instructions are required when there has been both lay and expert testimony must be decided on a case by case basis. The issue of sanity may be raised by lay testimony, thereby requiring the general instructions on sanity. *United States v. Thomas*, 48 C.M.R. 865 (A.C.M.R.1974). If there has been expert psychiatric testimony, the members are not necessarily bound by that testimony. The members themselves determine what credibility and weight are to be given to expert testimony. *United States v. Wynn*, 11 U.S.C.M.A. 195, 29 C.M.R. 11 (1960) and *United States v. Wilson*, 18 U.S.C.M.A. 400, 40 C.M.R. 112 (1969). Accordingly, if there has been conflicting testimony by both lay and expert witnesses on the issue of sanity, the lay testimony alone may support a find-

ing of sanity despite psychiatric opinion to the contrary. *United States v. Carey*, 11 U.S.C.M.A. 443, 29 C.M.R. 259 (1960); *United States v. Merrill*, 34 C.M.R. 901 (A.F.B.R. 1964); and *Brock v. United States*, 387 F.2d 254 (5th Cir. 1967).

■ Neither the Manual, *supra* (see paragraph 122c) nor case law requires the trial judge to instruct the members that lay testimony can overcome expert psychiatric testimony. In the case *sub judice*, the substance of the instructions given conveys this concept, however, and it may be inferred that the members were well aware of the impact and weight that should reasonably have been given to the testimony of the lay witnesses in this case.

■ Instructions are adequate where they specifically draw the members' attention to the testimony of the lay witnesses and make it clear that this testimony is to be given equal weight with the testimony of the expert witnesses. In the instant case, all of the defense witnesses were lay witnesses and all of their testimony related in some way to the issue of mental responsibility. Most of the lay testimony dealing with the issue came from Warrant Officer Woodward and Chief LaRue, while appellant himself and the stipulated testimony of his aunt dealt with his alleged "blackouts" and the stipulated testimony of Miss Lopez dealt with appellant's demeanor during the murder of Staff Sergeant Wrin. Prior to instructing the members, the trial judge read to both trial and defense counsel the instruction on mental responsibility which he proposed to give. (R. 320). That instruction read in pertinent part:

> In determining this issue, you must consider all of the relevant facts and circumstances, including but not limited to the testimony of persons who observed the accused at Grande Island on 6 March 1974, as to his demeanor or deportment, the testimony of the accused concerning his lack of memory as to the blackouts, as it suggests underlying mental disorders. The testimony of Warrant Officer WOODWARD and Chief LARUE as to their opinions as to the mental condition

of the accused in the Correctional Center and the opinions of Doctors ILARDI and SIMPSON concerning the mental capacity of the accused and their opinion that the accused's personality disorder impaired the accused's ability to adhere to the right. (R. 320).

The clear import of the instruction was to direct the members to consider the lay testimony of the defense witnesses equally with the testimony of the psychiatrists. The defense counsel specifically stated that the defense was satisfied with the instruction. (R. 321). The trial judge after advising the members generally on the issue (R. 332), then used that exact instruction six times during the course of his lengthy instructions, each time specifically drawing the attention of the members to the defense's lay testimony as well as to the testimony of the psychiatrists. (R. 333, 333c, 336, 338, 340, 345). Because Mrs. Dunlap's testimony dealt solely with an alleged past incident "involving an episode of violence followed by an inability to recall on the part of" appellant (R. 264), the trial judge gave a special instruction on amnesia. (R. 346). Included prominently in that instruction was the testimony of Mrs. Dunlap. The clear intent of the instruction was to direct the member's attention to her testimony and its bearing on the issue of mental responsibility. Significantly, the trial judge further instructed the members that this lay testimony:

> . . . raises the issue of the accused's mental responsibility at the time of the alleged offenses charged. In determining this issue, you must consider all relevant facts and circumstances bearing on the accused's mental responsibility, including the lay testimony of Warrant Officer WOODWARD and Chief LARUE as well as the opinions of Doctors ILARDI and SIMPSON. (R. 346).

■ Read as a whole, the trial judge's instructions continually reminded the members of the lay testimony of defense's witnesses and the importance of considering that testimony in resolving the issue of mental responsibility. Each time

the instructions mentioned the expert witnesses, they mentioned the defense's lay witnesses. The substance of the instructions was clearly that the members were to consider both equally. In determining the sufficiency of a military judge's instructions to the members, "the question to be resolved is whether the instructions provide meaningful guideposts to the members during their deliberations." *United States v. McIntosh*, 12 U.S.C.M.A. 474, 476, 31 C.M.R. 60, 62 (1961). The trial judge in the case *sub judice*, provided those meaningful guideposts to the members on the subject of the lay testimony of the defense's witnesses.

Appellant's fourth assignment of error is denied.

V

THE CONVENING AUTHORITY PREJUDICIALLY AND ERRONEOUSLY FAILED TO DIRECT THAT APPELLANT'S CASE BE TREATED AS NONCAPITAL.

Appellant contends that the convening authority erred in failing to direct that his case be treated as noncapital, predicating his contentions on *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) that discretionary capital punishment under the UCMJ has been outlawed, and that accordingly, appellant was denied his "rights" to trial by judge alone, to plead guilty, and to negotiate a pretrial agreement, none of which is permitted in a capital case.

The precise issue raised by appellant was rejected by this Court in *United States v. Pittillo*, No. 73 2547 (N.C.M.R. 19 August 1975), *pet. denied*, No. 31,231 (U.S.C.M.A. 16 January 1976). There we held that the trial judge cured any error in the post-*Furman* capital referral by instructing the members that the maximum sentence was confinement for life. The trial judge's ruling rendered the case noncapital and preserved the accused's limited rights to plead guilty, negotiate a pretrial agreement and request trial by military judge alone. The accused's failure to exercise these respective rights was deemed a waiver in the *Pittillo* case.

Although the record in the case *sub judice*, discloses no attempt by the appellant to plead guilty or negotiate a pretrial agreement, appellant's individual counsel, in a post-trial brief submitted a year and one-half after trial, attaches an affidavit from one of the defense counsel at trial in which that counsel contends that the appellant attempted to negotiate two pretrial agreements for an agreed maximum sentence of 60 years and life imprisonment, respectively, in exchange for a plea of guilty to all major charges (presumably including premeditated murder) because "the defendant was convinced by the government's evidence that he was guilty of all major charges." By way of additional hearsay, the trial *defense* counsel, in his affidavit of 1 January 1976, advises that the desire of the defendant to plead guilty also stemmed from his "desire, upon advice of counsel, to be tried before military judge alone." The affiant then speculates that the convening authority's disapproval of the proffered pretrial agreements was predicated upon his (the convening authority's) express wish not to have the appellant tried by military judge alone. The affiant advises that this opinion was based upon "informal discussions" with trial counsel which discussions "in effect" stated this conclusion.

In extending the normal procedure of Courts of Military Review to allow the newly acquired individual defense counsel the opportunity to submit a rebuttal brief to the government's brief filed in reply to appellant's initial appellate brief, and in granting an almost two month extension of time to accomplish this, we did not intend that counsel attempt to enhance the record in this case with matters collateral to the evidence adduced at trial. Particularly were we not disposed to permit the introduction of second and third hand hearsay coupled with speculation in the form of an affidavit which contains far more opinion than fact. Nonetheless, we will give due consideration to the affidavit of trial *defense* counsel and assume that the appellant did attempt to negotiate one or more pre-

trial agreements with the convening authority for an agreed maximum sentence in exchange for a guilty plea to the major charges, including premeditated murder, because appellant felt he was guilty and desired trial by military judge alone. We will not presume the motives of the convening authority in disapproving the proposals, however, since that decision-maker's motives are not controlling in our consideration of this assignment of error, whatever they may have been.

The *Pittillo* case *supra* is dispositive of the case *sub judice*, with respect to appellant's contentions that his right to plead guilty and to negotiate a pretrial agreement were infringed. As in *Pittillo*, the trial judge instructed the court members that the maximum sentence was confinement for life. Thus appellant retained his right to plead guilty and negotiate a pretrial agreement. The record does not disclose, nor does the affidavit of trial *defense* counsel, discussed above, disclose any effort on the party of the appellant to negotiate a pretrial agreement at any time *after* the ruling by the judge. Having chosen not to make such efforts at that time, notwithstanding what may have been earlier, unsuccessful attempts to negotiate a plea, appellant waived his rights in these premises. Whether or not any later attempt would have been successful in light of the judge's ruling on the maximum sentence the member court could impose is not in issue. The right of the appellant extended to the opportunity to attempt to negotiate a guilty plea and/or plead guilty without any negotiation. He did not have an unqualified right to an acceptance of any offer to plead guilty based upon a pretrial agreement. And the motives of the convening authority for turning him down before trial are, as noted above, not controlling.

The issue of appellant's "qualified right" to trial by judge alone raises a different issue since appellant did affirmatively request trial by judge alone, and thus did not waive this right. It was within the trial judge's discretion, however, to deny appellant's request. The right to trial by judge alone is not unqualified. *See United States v. Scaife*, 48 C.M.R. 290 (A.C.M.R. 1974), *rev'd on other grounds*, 23 U.S.C.M.A. 234, 49 C.M.R. 287 (1974); *United States v. Dupree*, 45 C.M.R. 456 (A.F.C.M.R.1972), *pet. denied*, 45 C.M.R. 928; *United States v. Winn*, 46 C.M.R. 871 (A.C.M.R.1972), *pet. denied*, 46 C.M.R. 1324. Approval or disapproval of the request is vested in the sound discretion of the trial judge and his "determination should not be overturned in the absence of a clear showing of prejudicial error. . . ." *United States v. Winn*, *supra* at 872. Here, it is clear that the judge's denial of the request was based on reasonable considerations. The trial judge stated on the record that, in addition to potential jurisdictional problems this might raise, he had already heard or read much of the evidence in the case. More significantly, he had heard or read statements made by appellant to the psychiatrists, whose admissibility was dubious and in fact were not admitted. (R. 109). Thus, the judge, had he sat alone, would have been aware of incriminating statements made by appellant; whereas, the court members were not aware of these matters. Under these circumstances, the trial judge's knowledge of these matters, which might cast doubt on the ability of the judge to determine appellant's guilt or innocence, provided a sound basis for the denial of the request for trial by judge alone.

It is noted that the question of whether or not *Furman v. Georgia, supra,* applies to the military remains an open one. *Schick v. Reed*, 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430, 439 (1974). For the reasons elucidated above, the question need not be faced in this case. Appellant's fifth assignment of error is denied.

## VI

THE STAFF JUDGE ADVOCATE'S PRETRIAL ADVICE WAS PREJUDICIALLY ERRONEOUS, INADEQUATE, AND MISLEADING.

For the first time appellant attacks the Article 34, pretrial advice treatment of

the maximum permissible penalty that could be adjudged in this case. He asserts that the Article 34 letter is incorrect in advising the convening authority that the case could be referred as a capital case. We do not share this opinion and, as noted, whatever effect such referral had originally, the trial judge preserved appellant's rights as to pleas and negotiation of a pretrial agreement by his instruction to the members on the maximum permissible sentence of life imprisonment.

 In addition, it is noted that failure to object at trial to defects in the Article 34 letter is deemed a waiver of that objection and precludes any attack on the letter on appeal. *United States v. Eason*, 49 C.M.R. 844 (N.C.M.R.1974), *pet. denied*, No. 24,770 (U.S.C.M.A. 6 March 1975). *See also United States v. Donaldson*, 23 U.S.C.M.A. 293, 49 C.M.R. 542 (1975). The instant record is void of any indication that appellant raised an objection to the Article 34 letter at trial. By failing to raise the issue at trial, appellant has waived any objection to the letter on appeal. Accordingly appellant's sixth assignment of error is without merit and is denied.

## VII

### THE STAFF JUDGE ADVOCATE'S POST–TRIAL REVIEW IS PREJUDICIALLY INCOMPLETE, INADEQUATE AND MISLEADING.

 We find the assignment of error as to the adequacy of the post-trial review to be without merit. A detailed examination of the review indicates a careful and extensive study of the record of trial, an accurate summary of the evidence, clearly articulated opinions as to the adequacy and weight of the evidence, analysis of the findings, assessment of motions and the effect of any potential error or irregularity, a thorough critique of the issues both factual and legal, detailed recommendations on the various powers, actions and responsibilities of the convening authority supported fully by reasons for such recommendations, including matters of clemency, extensive commentary on the record and related matters, and well postulated opinions on the findings and sentence.

The contention of appellant that the review is so "fraught with error" that a new post-trial review is required is not supported in fact. Not only is the review more than adequate, but it is obvious that the convening authority gave extensive consideration to his own detailed examination of the record and related matters in addition to the written review. The review is dated 14 September 1974, but the convening authority's action was not taken until 6 November 1974, a time lapse that is indicative of the serious effort made by the convening authority to carefully review the entire record and exhibits that combine for well over 500 pages, and not rely solely on the review of his Staff Judge Advocate. Thus it is apparent to us that not only did the staff judge advocate present a thorough, detailed, accurate review to the convening authority to assist him in meeting his responsibilities, but the convening authority undertook to give personal, independent, full and fair consideration to the case before arriving at his ultimate determination on the findings and sentence. Such efforts are commendable and we find a careful safeguarding of the full rights of the accused arising out of such circumstances. Appellant's seventh assignment of error is denied.

## VIII

### CUMULATIVE ERROR REQUIRES THAT THE CONVICTION BE REVERSED.

We note no cumulative error in this case and find this assignment of error to be without merit.

## IX

### THE COURT LACKED JURISDICTION TO TRY THE ACCUSED.

 Appellant argues that the court-martial lacked jurisdiction because there was no written amendment to the convening order formally removing enlisted mem-

bers from the list of members following appellant's revocation of his earlier request for enlisted members. A written amendment is not required by either the Manual or the case law. In fact, ¶ 37c(2), MCM, 1969 (Rev.) specifically provides that the convening authority may excuse a member from attendance "by oral order, message, or signal and need not confirm the action by a written order." It is apparent from the record that the convening authority excused the enlisted members detailed by Convening Order Serial 23b–74 after receiving appellant's revocation of his request for enlisted members. Since the convening authority could do this without a formal written amendment to the convening order, the court-martial did not lack jurisdiction.

The findings and sentence approved on review below are affirmed.

Chief Judge CEDARBURG and Judge GLASGOW concur.