UNITED STATES, Appellee

v

KURT W. BRUX, Corporal, U. S. Marine Corps, Appellant

15 USCMA 597, 36 CMR 95

*Myron G. Ehrlich, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Commander Walter F. Brown,* USN, and *Lieutenant Paul Gardner, Jr.,* USNR.

*Major Paul F. Henderson, Jr.,* USMC, argued the cause for Appellee, United States.

## Opinion of the Court

FERGUSON, Judge:

Convicted by a general court-martial of unpremeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, the accused was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for twenty-four years, and reduction. Intermediate appellate authorities, ultimately reducing the period of adjudged confinement to seven years, otherwise affirmed. We initially granted accused's petition for review on May 6, 1964. On September 25, 1964, the accused's motion to remand the case to the board of review, for further inquiry into his mental condition, was granted in light of a post-trial determination that the accused lacked the requisite mental responsibility for his offense and capacity to participate in his trial and appeal. Thereafter, the board, considering such information and additional findings to the contrary in another competency proceeding, found accused responsible and capable and again affirmed the findings and sentence. The case is once more before this Court on the issues originally granted, which inquire whether it was proper for the law officer to rule upon the accused's competency to stand trial, subject to objection by any member of the court, and whether it was prejudicially erroneous to advise the members on the question of mental responsibility by an instruction incorporating the so-called "policeman at the elbow" test.

I

The charge against accused involved the killing of a fellow Marine after Brux had been informed by his wife that the deceased had intimate relations with her. At the beginning of the trial, four psychiatrists testified that, in their opinion, the accused lacked mental responsibility for the offense and capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his own defense. They opined that his condition had continued to deteriorate since the commission of the alleged offense and, because of the aberration involved, he was particularly unable to understand or cooperate with counsel regarding the various aspects of Mrs. Brux's relationship with the deceased. All found accused schizophrenic.

Psychiatrists appearing for the Government were of the view that accused possessed the requisite responsibility for his offense and the capacity to stand trial. They felt the accused was not psychotic but suffered from a severe emotional disturbance which led to extreme rage reactions on his part.

Based on the foregoing, the law officer ruled, subject to objection by any member of the court, that the proceedings should be stayed, as he was not satisfied "the accused does . . . possess sufficient mental capacity to adequately understand the proceedings and intelligently aid and cooperate in his own defense." The president of the court objected to the ruling and, in closed session and by a majority vote, the court overruled the law officer.

After presentation of the prosecu-

tion case on the merits, and further testimony regarding Brux's mental responsibility, the defense called accused's wife as a witness. As she began to testify concerning the deceased's intimacies with her, the following occurred:

"LO: Let the record reflect that the defendant suddenly jumped from his seat, overturned the table with his counsel, attacked trial counsel, struck or threw a number of blows. It took approximately ten men to control and subdue him, that he was carried from the courtroom, and that physicians were ordered into attendance."

An attending physician was of the opinion accused suffered "an acute hysterical reaction," prescribed and administered sedation to quiet him and believed, "After he is awakened . . . he will perhaps be as coherent as he was prior to the acute episode." He found it "impossible for me to predict" whether such reactions would occur again in the trial. There is no contention accused's conduct was in any way feigned or designed to mislead the court concerning his condition.

Following a continuance of two days, the court-martial was again convened, with the accused present. After some discussion and hearing the testimony of the attending physician, a member of the court moved for a further examination of the capacity of the accused to stand trial. The law officer granted the motion to continue the proceedings for that purpose but, once more, was overruled by the members.

Thereafter, accused, at his own request and against the advice of his attorneys, asserted he did not wish his wife to testify and, after proper explanation of his privilege, the law officer granted his desire. Mrs. Brux accordingly did not appear further in the case.

The defense resting, arguments were had, and the law officer proceeded to advise the court concerning the law applicable to the issues in the case. At the express request of defense counsel, he included in his instructions on mental responsibility controlling reference to the so-called "policeman at the elbow" test in the following terms:

". . . If the accused would not have committed the act had the circumstances been such that immediate detection and apprehension were certain, he cannot be said to have acted under an irresistible impulse."

II

The first issue before us involves whether the law officer properly ruled on the motion to continue the proceedings for lack of mental capacity on the part of the accused, subject to objection by any member of the court. If such were correct, then the court's action in denying the stay in the proceedings was proper, in light of the conflict in the evidence regarding such issue, even when the accused's later, apparently genuine outburst is considered. On the other hand, if he should not have permitted his ruling so to be overturned, then it is apparent that prejudicial error has occurred, for that determination was based on substantial evidence of incapacity, greatly supported and strengthened by the accused's conduct when his wife attempted to offer testimony favorable to him on the merits. We turn, therefore, to a close examination of the problem whether, as affects a granting of a continuance for mental incapacity, the law officer's ruling is final or subject to objection.

The basic charter of the law officer's powers is found in Code, supra, Article 51, 10 USC § 851. That Article provides pertinently as follows:

"(b) The law officer of a general court-martial and the president of a special court-martial shall rule upon interlocutory questions, other than challenge, arising during the proceedings. *Any such ruling made by the law officer of a general court-martial upon any interlocutory question other than a motion for a finding of not guilty, or the ques-*

*tion of accused's sanity, is final and constitutes the ruling of the court. . . . Unless the ruling is final, if any member objects thereto, the court shall be cleared and closed and the question decided by a voice vote as provided in section 852 of this title (article 52), beginning with the junior in rank."* [Emphasis supplied.]

The Manual for Courts-Martial, United States, 1951, interprets Code, supra, Article 51, as requiring the law officer's interlocutory ruling concerning the granting of a continuance on the basis of mental incapacity to stand trial to be one on "the question of accused's sanity" and, hence, made subject to objection by any member of the court. Manual, supra, paragraphs 57, 122. Indeed, such construction is extended even to the question whether an accused will be medically examined to determine his capacity and responsibility. Manual, supra, paragraph 122. On the other hand, ordinary continuances are to be ruled upon finally by the law officer. Code, supra, Articles 40, 51, 10 USC §§ 840, 851; Manual, supra, paragraph 58; United States v Knudson, 4 USCMA 587, 16 CMR 161.

The basic inquiry to be made, then, is whether the Manual rule is consistent with the Code, more particularly Article 51, supra, and Article 40, relating to the granting of continuances and placing such authority in the law officer. United States v Knudson, supra, at page 591. If there is no such inconsistency, then the Manual provision has the force and effect of law and we must accord it such. United States v Smith, 13 USCMA 105, 32 CMR 105. We turn, therefore, to the legislative background of the Article in question.

Prior to 1948, the Articles of War, as to general courts-martial, provided only for the services of a law member, who was not required to be an attorney or member of The Judge Advocate General's Corps (then Department), but could be any member of the court detailed by the convening authority "as specially qualified to

perform the duties of law member." Article of War 8, Act of June 4, 1920, 41 Stat 787. As such, he ruled finally only on "an objection to the admissibility of evidence offered during the trial," which phrase was statutorily declared not to include questions as to the "order of the introduction of witnesses or other evidence, nor of the recall of witnesses for further examination, nor as to whether expert witnesses shall be admitted or called upon any question, nor as to whether the court shall view the premises where an offense is alleged to have been committed, nor as to the competency of witnesses, as, for instance, of children, witnesses alleged to be mentally incompetent, and the like, *nor as to the insanity of accused, or whether the existence of mental disease or mental derangement on the part of the accused has become an issue in the trial,* or accused required to submit to physical examination," (emphasis supplied) and to many other exceptions normally disposed of by a civilian judge without reference of the matter to the jury. Article of War 31, Act of June 4, 1920, supra. In accordance with the statute, a ruling of the law member on the accused's mental capacity to stand trial was clearly made subject to objection by any member of the court. Manual for Courts-Martial, U. S. Army, 1928, paragraphs 51, 63.

In 1948, however, the first of the sweeping changes to come in military justice was enacted in the form of amendments to the Articles of War. Thenceforth, the law member was required to be an attorney and certified by The Judge Advocate General to be qualified for such detail. Article of War 8, supra, as amended by Act of June 24, 1948 (Public Law 759, 80th Congress). In recognition of this improvement in the law member's qualifications, the same amendments provided that his rulings on interlocutory questions would be final, except in three categories: those falling under challenges, "a motion for a finding of not guilty, or [on] the question of accused's sanity." Article of War 31, supra, as amended by Act of June 24,

1948 (Public Law 759, 80th Congress). Thus, while the long enumeration of exceptions to the finality of the law member's rulings was largely eliminated, Congress specifically retained those relating to mental capacity and responsibility, both questions "of accused's sanity." Hearings on H. R. 2575, 80th Congress, 1st Session, pages 1918, 2049. The Manual for Courts-Martial, U. S. Army, 1949, again in conformity to the amended statute, implemented the Article of War by providing that the law member's rulings on the competency of the accused were made subject to objection by any member of the court. Manual for Courts-Martial, 1949, supra, paragraphs 51*d*, 112.

Perusal of the legislative history of the Uniform Code establishes beyond cavil that its drafters likewise intended to make no change in this procedure when they created the post of law officer of a general court-martial and provided for the finality of his rulings except on challenges, motions for findings of not guilty, and questions of the accused's sanity. Code, supra, Article 51. The language used in the pertinent Article of the Code was taken intact from Public Law 759. Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 1073, 1074. Its language was "derived from A. W. 31," with deletion of language permitting the law officer to consult with the court before ruling. *Ibid.*, page 1073; House Report No. 491, 81st Congress, 1st Session, page 26; Senate Report No. 481, 81st Congress, 1st Session, pages 6, 23. The retention of the language and practice under the antecedent legislation clearly lights the way to the conclusion that now, as then, the law officer must rule on motions related to the accused's mental capacity, subject to being overturned by objection and majority vote of the court members.

The same conclusion is compelled by the language of Code, supra, Article 51, itself, *i.e.*, "the question of accused's sanity." It is to be noted that the Article does not refer to "mental capacity" or "mental responsibility," the former pertaining to the accused's ability to stand trial and the latter to his culpability for his acts. Rather it, in common with its predecessors, uses the more generic word "sanity," which comprehends *both* capacity *and* responsibility. 38 Words and Phrases (Perm ed), Sanity, page 243. The plain words of a statute are to be applied and not construed. United States v Ortiz, 15 US CMA 505, 36 CMR 3; United States v Dickenson, 6 USCMA 438, 20 CMR 154. We have no doubt, therefore, that the law officer of a general court-martial, on the question of mental capacity, must rule subject to objection by any member of the court.

Indeed, we have twice before so held, although, in the spirit of independently reconsidering the question, we have not heretofore alluded to such authorities. Thus, in United States v Lopez-Malave, 4 USCMA 341, 15 CMR 341, and in United States v Williams, 5 USCMA 197, 17 CMR 197, we squarely construed Code, supra, Article 51, to require the law officer's ruling on mental capacity to be made subject to objection by any member of the court, and laid out the procedure to be followed in making such decisions, which was, in fact, utilized by the law officer here.

Nor is such procedure unknown in other jurisdictions. See, for example, Jordan v United States, 207 F2d 28 (CA DC Cir) (1953); 14 Am Jur, Criminal Law, § 44; and cases collected in Annotation, 142 ALR 961, 1001. The question of competency to stand trial largely involves the sifting of various conflicting factual opinions given by expert witnesses, and, thus, basically, is an issue of fact. In 1949, legislation was enacted to provide that, in Federal practice, the district judge would ascertain "whether an accused person is insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense." Jordan v United States, supra, at page 29. See 18 USC § 4244, and United States v Nix, 15 USCMA

578, 36 CMR 76. Perhaps a similar change should be made in military practice, but that is a question for the Congress. At the present, it has seen fit to require determinations of competency to be made by the law officer, subject to objection by any member of the court, and it is not our function judicially to amend Code, supra, Article 51, to provide otherwise. Accordingly, we find the law officer's use of that procedure in this case free from error.

### III

Left for determination is the issue whether the instructions on mental responsibility are prejudicially erroneous in light of their inclusion of the so-called "policeman at the elbow" test. As indicated above, the evidence raises a strong issue on this point. Indeed, it was the only real defense tendered on behalf of the accused, with a number of distinguished experts appearing on his behalf. The question of his mental responsibility was accentuated by his apparently genuine outburst during the trial when the testimony of his wife, concededly critical to the defense on the degree of the homicide involved, was offered. It has continued to plague appellate authorities with the accused's bizarre behavior in post-trial confinement, again causing schism among new panels of experts as to the question of his responsibility. Taken as a whole, it is fair to state that we have seldom seen a record which raises such a disturbingly strong question concerning an accused's mental health at the time of his alleged offense.

An issue being raised on accused's mental responsibility, the instruction was clearly prejudicial. ▆▆▆▆ ■ United States v Jensen, 14 USCMA 353, 34 CMR 133; United States v Jordan, 14 USCMA 393, 34 CMR 173; United States v Moore, 14 USCMA 418, 34 CMR 198; United States v Alphin, 15 USCMA 14, 34 CMR 460; United States v Mathis, 15 USCMA 130, 35 CMR 102; United States v Smedley, 15 USCMA 174, 35 CMR 146; United States v Hacker, 15 USCMA 419, 35 CMR 391.

True it is that it was requested by defense counsel, and, normally, such action constitutes self-induced error which may not later be claimed as the basis for appellate reversal. United States v Ayers, 14 USCMA 336, 34 CMR 116; United States v Schafer, 13 USCMA 83, 32 CMR 83; United States v Jones, 7 USCMA 623, 23 CMR 87. But it is also our judicial duty to note plain error on the face of the record, in order to prevent a miscarriage of justice. United States v Russell, 15 USCMA 76, 35 CMR 48; United States v Ebarb, 12 USCMA 715, 31 CMR 301; United States v Rowan, 4 USCMA 430, 437, 16 CMR 4, 11. Cast in the light of the circumstances depicted here, it would be manifestly improper to leave untouched the critical question of Brux's responsibility, decided as it was under an entirely erroneous and improper standard. We decline, therefore, to apply the rule of waiver, predicated on self-induced error, under the peculiar facts before us, and, accordingly, order reversal.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Navy. A rehearing may be ordered.

Judge KILDAY concurs.

Chief Judge QUINN concurs in the result.