UNITED STATES

v.

Peter E. MARTINEZ, Jr., 562 29 5130, Seaman Apprentice (E–2), U. S. Naval Reserve.

NMCM 80 2547.

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 10 March 1980.

Decided 18 Dec. 1981.

LT Thomas P. Murphy, JAGC, USNR, Appellate Defense Counsel.

LCDR John C. Vinson, JAGC, USN, Appellate Government Counsel.

Before GLADIS, Senior Judge, and BOHLEN and ABERNATHY, JJ.

ABERNATHY, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his plea, of assault with intent to commit murder, a violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934. The court sentenced appellant to seven years confinement at hard labor, forfeiture of $430.00 pay per month for 84 months, reduction to pay grade E–1, and a bad-conduct discharge. The officer exercising general court-martial jurisdiction approved the sentence as adjudged.

We have read the extensive briefs submitted by both appellant and the Government, examined the record of trial, and considered the oral arguments made by both parties concerning two of the eleven assignments of error. We have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantive rights of appellant was committed. However, four assignments of error, numbers I, V, VI and VIII, merit some discussion.

## I

THE MILITARY JUDGE ERRED IN DENYING THE APPELLANT'S MOTION TO REOPEN THE PRETRIAL INVESTIGATION.

(A) THE INVESTIGATING OFFICER AND MILITARY JUDGE IMPROPERLY DETERMINED THAT THE APPELLANT'S REQUESTED WITNESSES WERE UNAVAILABLE.

(B) THE APPELLANT WAS DENIED A PRETRIAL INVESTIGATION

BEFORE A DISINTERESTED AND IMPARTIAL JUDICIAL OFFICER AS GUARANTEED BY THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

## I(A)

At the initial Article 39(a), UCMJ, 10 U.S.C. § 839(a), session of appellant's trial, individual military counsel moved to reopen the pretrial investigation "for an opportunity to obtain either in person or through some sort of statements, actually in person, interview witnesses on board the USS DEWEY (DDG 45) and the USS TRIPPE (FF 1075)...." (R. 23). During the course of the hearing it was determined that the DEWEY, the victim's and appellant's unit ship, had deployed to South America. Message traffic had been attempted as a means of obtaining information regarding the case, but this method was ineffective. The military judge felt that, based upon the prospective issues in the trial, there certainly were material witnesses on board the deployed vessels, especially as affected the credibility of the accused's performance as a sailor and his reputation for violence. (R. 39). Accordingly, the military judge recommended to the convening authority that trial counsel, individual military counsel, and assistant defense counsel be allowed to travel to South America to interview any of the DEWEY or TRIPPE shipmates they chose. Counselors did travel to the ships and subsequently interviewed members of the crew.

On 11 October 1979, the court-martial reconvened an Article 39(a) session. Motion to reopen the pretrial investigation was again entertained by a new military judge. Defense counsel based this motion upon two grounds: (a) to effectuate a meaningful cross-examination of the victim based upon the information gathered from shipmates during the recent excursion to South America; and, (b) to submit character reputation evidence of the accused and the victim. Defense counsel argued that then, the convening authority could make an informed forum referral based upon these recent, relevant considerations. (R. 62–65). In support of this motion appellant called the investigating officer, Captain (CAPT) Nangle, U. S. Marine Corps, as his only witness.

On direct examination CAPT Nangle testified that witness requests were made for several of the ships' crewmembers, but he summarily ruled them all unavailable. Defense counsel stressed the issue of credibility, for both the victim and the accused, as an important material factor in support of the witness requests. Defense counsel, however, could not offer any particular, proposed testimony of the requested witnesses to substantiate alleged materiality. The military judge asked CAPT Nangle just what conclusions were made in his witness availability analysis. CAPT Nangle responded: first, given no evidence which showed that the request was for material witnesses, and second, given the fact that both counsel verified that the ships were deployed to South America, he chose not to go to the witnesses' commanding officer with an availability request as recommended by paragraph 34d, *Manual for Courts-Martial, 1969 (Rev.)* (MCM).[1]

The military judge denied defense's second motion to reopen the pretrial investigation with the proviso that defense counsel could depose the victim to establish a record of cross-examination based upon the recent shipmate interviews, for trial purposes. This proviso was accepted.

After a review of the purpose and background of an Article 32 investigation, witness availability standards thereunder, and the circumstances of the case, we find that the pretrial investigating officer properly ruled that the requested witnesses were unavailable.

---

1. All available witnesses, including those requested by the accused, who appear to be reasonably necessary for a thorough and impartial investigation will be called and examined in the presence of the accused and his counsel. Ordinarily, application for any witness subject to the military law will be made to the immediate commanding officer of the witness, who will determine the availability of the witness. Paragraph 34d, MCM.

■ The two-fold purpose of an Article 32 pretrial investigation is substantially entrenched in the military justice system: first, as a discovery tool for the accused, and second, as a means of establishing probable cause for referring the charges to trial. *United States v. Ledbetter,* 2 M.J. 37 (C.M.A.1976); *United States v. Samuels,* 10 U.S.C.M.A. 206, 27 C.M.R. 280 (1959); *United States v. Wagner,* 10 M.J. 546 (N.M.C.R. 1980); *United States v. Alford,* 8 M.J. 516 (A.C.M.R.1979); *United States v. Chestnut,* 4 M.J. 624 (A.F.C.M.R.1977); *See* Murphy, *The Formal Pretrial Investigation,* 12 Mil.L.Rev. 1 (1961); paragraph 34a, MCM.

■ Neither the Code, nor the *Manual* defines "available" as it applies to witnesses requested for the Article 32 investigation. Since 1976, however, the Court of Military Appeals has established a balancing test for addressing the issue of pretrial investigation witness availability. Witness availability cannot be measured solely in terms of distance. The significance of the witness' testimony must be weighed against the relative difficulty and expense of obtaining the witness' presence at the investigation. *United States v. Ledbetter, supra* at 44. In the wake of decisions which have followed,[2] one case more particularly addresses the principles and circumstances which faced CAPT Nangle.

■ Since the Article 32 investigation operates as a discovery proceeding for the accused and stands as a bulwark against baseless charges, the balancing test set out in *United States v. Ledbetter, supra,* must be employed to determine the availability of a witness for *either* side whose presence is requested in furtherance of those purposes. *United States v. Thomas,* 7 M.J. 655, 657 (A.C.M.R.1979). Nevertheless, when the witness sought is not one to be called by the prosecution at trial, the defense properly may be required to provide information upon which a determination of the signifi-

cance of the witness' testimony may be based. *Id.* Here, trial defense counsel failed to present the investigating officer with any information concerning the significance of the requested witnesses' testimony that would tend to outweigh the obvious delay and expense accompanying the witnesses' travel from South America. The speculation which surrounded defense's alleged materiality was not sufficient cause in the face of obvious travel expense and delay. Accordingly, the pretrial investigating officer did not err when he ruled the requested defense witnesses unavailable without consulting those witnesses' commanding officer. *See United States v. Thomas, supra* at 657–658.

Allegations of error regarding the military judge's final ruling still remain. At the initial Article 39(a) session defense counsel presented the trial judge with the specific names of witnesses, specific information which was unsuccessfully sought through message traffic with the embarked vessels, and proffered that the information sought through message traffic would tend to establish appellant's and the victim's prior relationships, credibility and shipboard reputations for peacefulness. As a result, the trial judge was provided with much more substantive and pertinent information regarding the relevance of the requested witnesses than the pretrial investigating officer. The trial judge concluded that the requested witnesses were relevant and that the expense and delay of securing their testimony did not outweigh the importance of the evidence. (R. 39). *See United States v. Ledbetter, supra.* Consequently, the shipmates were made available and interviewed in South America. After the trip to South America, at a subsequent Article 39(a) session, the trial judge offered a proviso which entitled defense counsel to depose the victim. This deposition was in-

---

2. Since *United States v. Ledbetter,* 2 M.J. 37 (C.M.A.1976), several cases have grappled with similar issues under ever-differing circumstances. Meaningful, helpful guidelines for application of the *Ledbetter* test have evolved: *See United States v. Chestnut,* 2 M.J. 84 (C.M.A.

1976); *United States v. Cumberledge,* 6 M.J. 203 (C.M.A.1979); *United States v. Chuculate,* 5 M.J. 143 (C.M.A.1978); *United States v. Chestnut,* 4 M.J. 642 (A.F.C.M.R.1977); and *United States v. Jackson,* 3 M.J. 597 (N.C.M.R.1977).

tended to establish a record of cross-examination based upon shipmate interviews and became available for use at trial.

■ Appellant alleges that the convening authority may have referred this case to the less severe forum of special court-martial had he been aware of this cross-examination based upon shipmates' testimony gathered in South America. Regardless of the speculation which gives rise to this allegation, there is substantial evidence in the investigation record which clearly supports the convening authority's action to refer this case to general court-martial. The very nature of the crime, evidence of the violent wounds inflicted upon the victim, and the seriousness of the charges merit referral to a general court-martial forum. We find no fair risk that the convening authority would have referred such charges to a lesser forum had he been advised of the evidence of the victim's credibility and reputation for violence.

■ Defense counsel had adequate, ample opportunity to develop their case through the discovery afforded them in the trip to South America. Cross-examination of the victim, based upon discovery information, was preserved for trial in the form of deposition. The opportunities to secure material witnesses, prepare an adequate defense and confront any witnesses against appellant were amply provided and employed. The purposes of the pretrial investigation, discussed *infra*, were adequately fulfilled. Accordingly, the military judge did not err in refusing to reopen the Article 32 investigation.

### I(B)

In the second portion of appellant's first assignment of error, it is alleged that the pretrial investigation was not before a disinterested and impartial judicial officer as guaranteed by the due process clause of the Fifth Amendment of the U. S. Constitution. For the reasons discussed below, we disagree.

At the pretrial investigation it was voluntarily revealed that the investigating officer was, at the time of the investigation, a trial counsel in the military justice trial division of the Naval Legal Service Office, Charleston, South Carolina. LT Kornstein, who had been originally appointed trial counsel for the present case, had recommended and proposed CAPT Nangle's appointment as investigating officer. LT Kornstein was CAPT Nangle's supervising officer. Appellant was aware of all these circumstances before the investigation began, but no objection was made. *See* Investigation Exhibit 9 and Investigation record at 7.

■ Acceptance of the investigating officer after full disclosure of any possible biases, prejudices, or improprieties precludes appellant from challenging the partiality of the investigation at his court-martial. *United States v. Lopez*, 20 U.S.C.M.A. 76, 42 C.M.R. 268 (1970). Appellant's failure to object after CAPT Nangle's relationship to trial counsel was revealed clearly places this issue of partiality within the realm of waiver and the rule enunciated in *United States v. Lopez*. But appellant contends that the U. S. Supreme Court case of *Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), overruled the waiver doctrine established in *United States v. Lopez*.[3] We do not agree. Where an accused is represented by competent counsel and any facts which might substantiate an objection to the investigating officer based upon bias or, impartiality, are known to the accused, an immediate objection is required, or the issue is waived.

■ In the instant case, facts substantiating any objection for judicial impartiality

---

**3.** In *Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the Court reversed a conviction for two traffic offenses by the traffic court trial judge who also served as mayor of the local municipality. Where these traffic fine revenues compromised a significant portion of municipal income and an administrative duty of the mayor, the accused was denied due process. Being tried by a judge who had "two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Id.* at 60, 93 S.Ct. at 83.

were known to appellant before the investigation began. Appellant was represented by trained, competent, legal counsel. This knowledge and legal representation, not present in *Ward v. Monroeville*, sufficiently distinguishes the application of the due process doctrine espoused therein. The great majority of state and federal jurisdictions support this conclusion. An immediate objection is required where facts evincing bias, impartiality, or some other basis for challenge to a judicial officer are evident. Otherwise, the issue is waived. *See* Annot., 73 ALR 2d 1238 (1962); 46 Am. Jur.2d *Judges* §§ 224–228 (1969), and recent cases cited therein. Accordingly, appellant's failure to object at the outset of the Article 32 investigation, when the investigating officer revealed his relationship to trial counsel, waives any review of the alleged error. Under the circumstances of this case the doctrine of *United States v. Lopez*, is unaffected by the holding of *Ward v. Monroeville*. *See generally United States v. Castleman*, 11 M.J. 562, 564–565 (A.F.C.M.R.1981); 28 U.S.C. § 455 (1974); *Idaho v. Freeman*, 507 F.Supp. 706 (1981); and *United States v. Conforte*, 624 F.2d 869 (9th Cir. 1980), *cert. denied* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

## V

THE EVIDENCE IS INSUFFICIENT TO PROVE THE MENTAL CAPACITY OF THE APPELLANT AT THE TIME OF THE TRIAL BEYOND A REASONABLE DOUBT.

A. THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE APPELLANT POSSESSED SUFFICIENT MENTAL CAPACITY TO CONDUCT OR COOPERATE INTELLIGENTLY IN HIS DEFENSE.

B. THE PSYCHIATRIST ON THE SECOND SANITY BOARD WAS ALSO THE PSYCHIATRIST ON THE FIRST SANITY BOARD, THEREBY TAINTING THE FINDINGS OF THE SECOND BOARD.

4. *See* Paragraph 121, MCM.

## V(A)

On 21 November 1979, the military judge ordered a psychiatric board [4] to determine if appellant could cooperate in his own defense. There, appellant recounted the events of the day of the offense in "an appropriate fashion, with good memory and no thought disorder." The board reviewed appellant's past history and found no indications of behavioral or psychological problems. The accused was examined and diagnosed as an obsessive compulsive personality which indicated a mental health aberration, but not a mental defect or disease. The board adopted this conclusion as the proper diagnosis and expressed the categorical opinion that appellant "was capable of assisting in his own defense." *See* Appellate Exhibit (AE)–6.

On 17 December 1979, defense counsel requested that the military judge inquire again into appellant's mental capacity to stand trial. (R. 134). After brief consideration of defense and government documents offered on the motion, the trial judge ordered that appellant be admitted to the neuropsychiatric service of the Naval Regional Medical Center (NRMC), Charleston, S. C., for observation and testing. The military judge specifically requested that, among other concerns, appellant's mental capacity to stand trial and his mental responsibility at the time of the offense be reviewed and investigated. *See* AE XXIV.

On 19 February 1980, the issue of mental capacity was litigated. Government presented the testimony of Lieutenant Commander (LCDR) Msuku, a psychiatrist at the NRMC and the officer-in-charge of appellant's original psychiatric board. Chief Petty Officer J. R. Sanborn, Chief Master-at-Arms (CMAA) for Barracks 31 where appellant was restricted, and Seaman Martinez, appellant's roommate at Barracks 31, also testified for the Government. Defense offered the testimony of Dr. Wm. H. Snyder, Ph.D., a clinical psychologist, and Dr. J. F. Abess, MD, a psychiatrist. Both

defense witnesses were paid civilian experts. Over 100 pages of the record of trial reflect the in-depth pursuit of this issue by the military judge. (R. 143–247). Several exhibits were also admitted in support and clarification of the expert witnesses. *See* AE 7, Q, R, U, AA, EE, CC.

■ Based upon the extensive evidentiary development of the issue the military judge found beyond a reasonable doubt that appellant had a rational and factual understanding of the proceedings against him. The court specifically found that appellant had sufficient present ability to consult with his counsel and possessed a reasonable degree of rational understanding. While the trial judge did doubt the soundness of appellant's mental health, the court was satisfied beyond a reasonable doubt that his present mental state did not materially affect his capacity to assist in his own defense. (R. 247). After a review of the record we conclude that there is sufficient evidence to support the military judge's ruling. Furthermore, our separate review of the record convinces us beyond a reasonable doubt that appellant possessed the requisite mental capacity to stand trial.[5]

■ Conviction of an accused person while he is legally incompetent violates due process, and court procedures must be adequate to protect this right. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). The *Manual* reflects this common law standard for mental capacity to stand trial in the two part test enunciated in paragraph 120*d*, MCM:

No person shall be brought to trial unless he possesses sufficient mental capacity to understand the nature of the proceedings

against him and to conduct or cooperate intelligently in his defense.

A number of courts have stated that it is not enough for the trial judge to find that the accused is oriented as to time and place and had some recollection of events; the test is whether he had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *United States v. Victor,* 36 C.M.R. 814 (C.G. C.M.R.1966), and cases cited therein.

■ To assist in defense does not refer to matters involving legal questions, but to such phases of the defense as an accused would normally assist in, such as, accounts of facts, identities of witnesses, and similar matters. *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1975). The question is whether the accused is possessed of sufficient mental power, and has such understanding of his situation, such coherency of ideas, control of his mental facilities, and the requisite power of memory, as will enable him to testify in his own behalf, if he so desires, and otherwise to properly and intelligently aid his counsel in making a rational defense. *United States v. Williams,* 5 U.S.C.M.A. 197, 206, 17 C.M.R. 197, 206 (1954). If a defendant is capable of understanding the nature and object of the proceedings against him and can conduct his defense in a rational manner, he is sane for the purposes of being tried, though on some other subject his mind may be deranged. Indeed, more is required to raise a doubt as to an accused's capacity to stand trial than testimony that

---

**5.** The question of competency to stand trial largely involves the sifting of various factual opinions given by expert witnesses, and thus, basically, is an issue of fact. *United States v. Brux,* 15 U.S.C.M.A. 597, 601, 36 C.M.R. 95 (1966). This Court is not, however, limited in its appellate *review of a case to the narrow* question of whether a court-martial which heard witness testimony, correctly answered the question of mental capacity. The Court of Military Review can and must consider any and

all evidence which relates to the issue of mental capacity regardless of whether that evidence was before the court-martial. *United States v. Victor,* 36 C.M.R. 814, 815 (C.G.C.M. R.1966). Our review of this issue must extend to a detailed re-examination of any and all relevant information, both on and off the record, which might affect the determination of competency to stand trial. *See* Paragraph 66*c*, MCM; *United States v. Taliau,* 7 M.J. 845 (A.C. M.R.1979).

he is immature, dangerous, psychopathic or even homicidal. The proof that an accused has a mental illness does not, *per se*, make him incompetent to stand trial. *Feguer v. United States*, 302 F.2d 214 (8th Cir. 1962), *cert. denied* 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962); *United States v. Williams, supra; United States v. Burns*, 2 U.S.C.M.A. 400, 9 C.M.R. 30 (1953); *United States v. Victor, supra* at 816.

█ Often, the issue of mental capacity or mental responsibility requires the balancing of contrary expert opinions. *United States v. Brux*, 15 U.S.C.M.A. 597, 36 C.M.R. 95 (1966). The proper and effective analysis of varying expert psychological opinions is a difficult task, but certain factors emerge as helpful guideposts. The professional qualifications and expertise of the witness must be given high priority. While a brief period of examination or observation does not necessarily adversely affect any conclusion, the duration of a psychological interview or the length of diagnostic observation is an important consideration. The length of time elapsed from the date of offense to the date of examination is another reference. Also, the extent of personality background materials used by the examiner is another consideration. These factors, combined with the evidence presented about the circumstances of the case facilitate a resolution of conflicting expert psychological opinions. *See* Annot., 23 A.L.R.Fed. 710 (1975).

█ Factors in appellant's behavior which were most often stressed as indicative and supportive of defense experts' diagnoses included the accused's lack of observable anxiety during the stressful period of a court-martial and appellant's persistent tales of grand accomplishments and personal background.[6] The results of both Government and defense psychometric tests

were virtually identical.[7] Nothing in any test strongly indicated or supported a psychotic diagnosis. In fact, the results of every test were within "normal" ranges, with some "tendencies" that supported an unhealthful diagnosis. Testimony on this factor did not vary. Dr. Snyder clearly expressed the difficulty of clear-cut diagnoses, and Dr. Abess reflected a wavering foundation for his conclusion, changing his initial diagnosis after consultation with Dr. Snyder. All expert witnesses did agree that appellant showed traits of a personality disorder, but the crux of disagreement was the stage or position on the psychological continuum in which these disorders lay. Qualifications of the experts were essentially equivalent; Dr. Snyder had been practicing psychology longer than either Dr. Abess or LCDR Msuku, but LCDR Msuku's practice was more closely related to appellant's circumstances and alleged mental problem. LCDR Msuku observed appellant at a time more closely connected to the offense when the accused was examined at the first sanity board in November 1979, and LCDR Msuku had the important factor of an extended and controlled period of observation at the NRMC. The categorical opinions of Dr. Abess concerning appellant's ability to recall and relate to counsel the incidents at issue totally supported LCDR Msuku's conclusion that appellant possessed sufficient mental capacity to understand the circumstances of trial as well as effectively assist in his personal defense. These considerations have convinced us beyond a reasonable doubt that appellant possessed sufficient mental capacity to understand the nature of the proceedings against him and to conduct or cooperate intelligently in his defense.

### V(B)

█ Defense counsel specifically questioned LCDR Msuku about his objectivity

---

6. Appellant consistently told counsel and expert witness that he was an award winning disco dancer, that his father was a flyer with the Navy Blue Angels, that his mother was a nurse and that he'd been chosen as an interpreter for the ship's upcoming South American deployment. These observations were substantiated by both parties' experts, but conclusions

as to diagnostic effect differed between "delusions" and "conscious lies."

7. The Weschler Adult Intelligence Scale, Minnesota Multiphasic Personality Inventory, and the Rorschach, "inkblot," tests were administered to appellant on separate occasions by different personnel.

and integrity regarding a subsequent diagnosis which may have been contrary to the original sanity board's recommendation. LCDR Msuku's unequivocal and professional response that if so convinced, he would, of course, revise his diagnosis convinces this Court that appellant's assignment of error is without merit. (R. 190).

## VI

THE GOVERNMENT FAILED TO PROVE THE GUILT OF THE APPELLANT BEYOND A REASONABLE DOUBT, IN THAT THE EVIDENCE PROFFERED TO PROVE HIS SANITY IS INSUFFICIENT TO PROVE SANITY BEYOND A REASONABLE DOUBT.

■ If a reasonable doubt exists as to the mental responsibility of the accused for an offense charged, the accused cannot be legally convicted of that offense. A person is not responsible for criminal conduct if at the time of such conduct as the result of a mental disease or defect the person lacks substantial capacity to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of the law. Paragraph 120*b*, MCM; *United States v. Frederick*, 3 M.J. 230, 237 (C.M.A. 1977).

■ The accused is presumed initially to be sane and to have been sane at the time of the offense. *United States v. Riege*, 5 M.J. 938 (N.C.M.R.1978). The burden of proving the sanity of the accused, like every other fact necessary to establish the offense alleged, is always upon the prosecution and when the sanity of the accused becomes an issue, the prosecution should introduce any available evidence tending to prove his sanity. The sanity of the accused

becomes an issue only after some evidence is introduced which would reasonably tend to show the accused is insane. Paragraph 122a, MCM; *United States v. Vanden*, 1 M.J. 879 (A.F.C.M.R.1976).

While there is a vast difference between the medical and legal standards which govern the capacity to stand trial and mental responsibility at the time of the offense the analysis of conflicting expert testimony on these issues is virtually the same. *See* Annot., 23 A.L.R.Fed. 710 (1975). Consequently, the factors cited in our discussion of Assignment of Error V are relevant to the present issue.

■ Since the same expert witnesses testified on the issue of mental responsibility, based upon the same examinations and observations, with much the same conclusions, we will not repeat the lengthy analysis. Suffice to say that based upon that format of analysis, the testimony of the experts, the circumstances of the case, and the recorded behavior of the accused, we must conclude that the Government has sufficiently proved appellant's sanity; appellant possessed the requisite mental responsibility at the time of the offense. *See United States v. Cleveland*, 6 M.J. 939, 943–944 (A.C.M.R.1979).

## VIII

THE GOVERNMENT FAILED TO PROVE THE GUILT OF THE APPELLANT BEYOND A REASONABLE DOUBT, IN THAT THE EVIDENCE IS INSUFFICIENT TO PROVE THE LACK OF SELF-DEFENSE BEYOND A REASONABLE DOUBT.

Self-defense has long been recognized as a special defense in the military justice system.[8] *See United States v. Perry*, 16

8. The defense of self-defense when the accused intended to kill or to inflict grievous bodily harm is composed of two elements. First, the surrounding circumstances must have been such that reasonable grounds existed to apprehend that death or grievous bodily harm was about to be inflicted on the accused or on a person he could lawfully defend and the accused must in fact have had

such an apprehension. Secondly, the accused must have believed that the force he used was necessary for protection against death or grievous bodily harm.

The test for the first element, insofar as it related to reasonableness, is whether, considering all the circumstances, a reasonable, prudent person would believe that there was ground to apprehend death or grievous bodi-

U.S.C.M.A. 221, 36 C.M.R. 377 (1966); *United States v. Jackson*, 15 U.S.C.M.A. 603, 36 C.M.R. 101 (1966); *United States v. Regaldo*, 13 U.S.C.M.A. 980, 33 C.M.R. 121 (1963). While we feel that the issue of self-defense was raised by the evidence, properly instructed upon and submitted to the members,[9] we do not believe that appellant's theory is a viable explanation for his actions. For the reasons discussed below, we cannot find merit in appellant's assigned error.

The incident was witnessed by appellant and the victim, Petty Officer Third Class Lamping. Lamping's testimony and a statement made by appellant to the apprehending officer are the only versions of the event on record.

Sometime on 9 May 1979, appellant asked Lamping if he could borrow Lamping's car to drive home from the ship in the rain. Very early the next morning, Lamping was awakened and informed that his car had been wrecked. Appellant voluntarily offered to make restitution in the amount of $800.00. Lamping contacted his insurance company and was assured that his automobile policy would cover the costs of repair, estimated at $600.00. Daily, however, Lamping asked appellant for the money. Together they tried securing a loan from the local credit union, and Lamping even attempted to garnish appellant's wages. There was evidence that Lamping owed money to shipmates and was financially strapped with obligations to a girlfriend.

On 22 May 1979, appellant told Lamping that part of the money to repay the debt was in a car on the pier parking lot. The two men were seen leaving the ship together, but no verbal exchange between them had been noted by anyone on board that day. The car was not in view of the ship. After arriving at the car appellant remarked that the automobile was having trouble and asked Lamping to look under the hood while he returned to the ship to retrieve the car door key which he had forgotten. Appellant returned with the wrong key. Entrance to the car was finally gained with a coathanger. Appellant told Lamping that the money was under the car seat, but the victim could not find the cash. As Lamping backed out of the car he felt a sharp pain in his back, fell to the ground and remembered appellant standing over top of him saying. . . "close your eyes, it will be over soon." The victim did manage to make his feet after some time and run to the ship's gangplank where two officers restrained Lamping and summoned an ambulance. Lamping was transported to the base hospital where extensive surgery and extended intensive care was required to repair three massive knife wounds. The attending physician testified that Lamping most certainly would have died if not immediately treated.[10]

Appellant was apprehended in his apartment shortly after the incident. After proper interrogation, apprehension and custody warnings, appellant told the arresting officers several versions of the incident.

---

ly harm. This test is objective in nature, and accordingly such matters as emotional instability or drunkenness on the part of the accused are irrelevant in this connection. On the other hand, such matters as the relative height, weight, general build of the antagonist and the possibility of a safe retreat are ordinarily relevant with respect to this test. The test for the second element, that the accused believed the force which he used was necessary to protect against death or grievous bodily harm, is subjective in nature. The accused is not objectively limited to the use of reasonable force. Accordingly, such matters as the accused's emotional control and intelligence are relevant in determining his actual belief as to the force necessary to repel the attack. Paragraph 216c, MCM.

**9.** *See United States v. Shufford*, 7 M.J. 716 (A.C.M.R.1979); *United States v. Whitfield*, 7 M.J. 780 (A.C.M.R.1979); *United States v. Waldron*, 9 M.J. 811, 820 (N.C.M.R.1980).

**10.** Captain James V. Sharp, Medical Corps, U. S. Navy, testified that Lamping had lost nearly the entire reservoir of his body's blood. An artery had been severed in the lung by the deep back wound. The lung itself was also seriously damaged and bleeding profusely. This wound measured nine inches in depth. Two other wounds penetrated the side and front of the chest to a depth of nearly six inches. Clearly, very hard force was applied to inflict these wounds.

The accused said that he and Lamping were fighting over a girl, that Lamping had struck him with a beer bottle, and that Lamping had initiated a fistfight over a debt regarding the damaged car. Appellant mentioned several injuries from the fight, but no physical evidence of the alleged abrasions, scratches or marks were found. The apprehending officer did, however, notice some swelling under appellant's lip and a contusion on the right upper cheekbone. Appellant's roommate testified that when the accused returned to their apartment on the day of the incident there was some bleeding from appellant's lip and a "mouse" under his eye. The accused eventually admitted exaggerating his original story somewhat. Appellant's final, adopted version of the incident was that a fistfight occurred over the car debt.

Much of the testimony concerned appellant's and the victim's reputation on board ship for peacefulness. Lamping was known for loud, sometimes angry outbursts on board ship. There was some indication that he often focused this anger on inanimate objects, such as tools or compartment furnishings. The victim had been counselled about his temper on one occasion, but several shipmates testified that, while loud, Lamping never used physical violence on anyone. Appellant was a good sailor in the eyes of his shipmates, peaceful, easy going, diligent and reserved. One other factor of importance should be noted; Lamping outweighed appellant by approximately 45 pounds. Viewing all the evidence in a light most favorable to appellant, we will assume that a fistfight erupted in the parking lot over the automobile debt.

■ Background events, such as the emphatic debt collection attempts of Lamping, the physical size differential, and the reputation of the victim for violent outbursts of temper are all factors which could support a reasonable conclusion on the part of appellant that grievous bodily harm might result from a fight with Lamping. The nature of appellant's injuries, his alleged comment to Lamping after the first stab wound, and the possibility that an avenue of retreat was open to appellant does not lend support to the accused's theory.[11] Balancing these factors, we cannot conclude that appellant meets the first, objective prong of the *Manual's* test for self-defense.

■ The second prong of the relevant test for self-defense, requires a subjective belief that the force employed was necessary under the circumstances. The testimony of Dr. Sharp concerning the vicious, multiple wounds inflicted upon Lamping does not support this portion of the self-defense standard. Evidence clearly demonstrates that the victim could be incapacitated after the initial knife wound. The repeated, forceful stabbings take appellant beyond any conceivable subjective standard. Even considering potential or possible emotional instability,[12] we find no substantial reasons to believe that appellant felt the force used was necessary, nor is there any evidence on the record which shows any belief on the part of appellant that his extreme action was required under the circumstances.

■ The theory of self-defense is protection, and if excessive force is used against an assailant, the defender becomes the aggressor. *United States v. Strauk*, 12 U.S.C.M.A. 156, 30 C.M.R. 156 (1961). While this principle does not restrict one to the precise force threatened by an assailant, the force employed must be one which the accused believes to be necessary in view of all the circumstances of the record. *United States v. Acosta-Vargas*, 13 U.S.C.M.A. 388, 32 C.M.R. 388 (1962). We are convinced beyond any reasonable doubt that under the circumstances, no reasonable person could

---

11. The fight occurred in an open parking lot, near appellant's ship. Safety was a short, unobstructed distance away. While lack of retreat is no longer a categorical requirement for self-defense, it is still an important factor. *See United States v. Hayden*, 13 U.S.C.M.A. 497, 33 C.M.R. 29 (1963); *United States v. Kabut*, 20 U.S.C.M.A. 393, 43 C.M.R. 223 (1971); *Brown v. United States*, 256 U.S. 335, 41 S.Ct. 501, 65 L.Ed. 961 (1921).

12. Paragraph 216c, MCM.

have feared grievous bodily harm.[13] Appellant does not show a conviction that the force he employed was necessary to prevent personal grievous bodily harm. Rather, appellant's action evinces the position of aggressor. Consequently, we find no merit in Assignment of Error VIII.

Accordingly, the findings and sentence as approved on review below are affirmed.

Senior Judge GLADIS and Judge BOHLEN concur.

13. This instance of verbal pressure and possibly even fisticuffs reflects a situation more closely akin to self-defense in circumstances where a reasonable person would apprehend injury less than death or grievous bodily harm. *See* Paragraph 216c, MCM.